1

2

3

4

5

6            IN THE UNITED STATES DISTRICT COURT

7              FOR THE DISTRICT OF ARIZONA

8

9  United States of America,              )   No. CR-97-237-PHX-ROS
                                          )       CV-03-1057-PHX-ROS (LOA)
10            Plaintiff/Respondent,        )
                                          )   **REPORT AND RECOMMENDATION**
11  vs.                                    )
                                          )
12  Larry Ray Eames,                       )
                                          )
13            Defendant/Movant.            )
                                          )
14  _____   )

15          This matter arises on Movant's Amended Motion to Vacate, Set Aside, or Correct

16  Sentence Pursuant to 28 U.S.C. § 2255 (documents # 1310, # 1311) Respondent has filed a

17  Response (document # 1316) to which Movant has replied.  (document # 1317)

18                      **PROCEDURAL BACKGROUND**

19          On June 17, 1997, a federal grand jury returned an indictment charging Movant and

20  several co-defendants with conspiracy, multiple counts of mail and wire fraud, and conspiracy

21  to commit money laundering. (document # 1[1]) The indictment also charged Movant with

22  multiple counts of money laundering in violation of 18 U.S.C. § 1956 and monetary transactions

23  in violation of 18 U.S.C. § 1957.  (document # 1) On October 1, 1997, the grand jury indicted

24  Movant and several co-defendants in a second case, District of Arizona No. CR 97-452 PHX-

25  PGR ("the second case").  This indictment alleged that Movant and his co-defendants resumed

26  their fraudulent activities after June 17, 1997 while on pretrial release.  On April 22, 1998, the

27  _____

28          [1]  Citations to "document # ___" are to documents in the Court's file CR-97-237-PHX-ROS.
    The abbreviation Tr. refers to the trial transcript and is followed by a date and page number.

1   grand jury returned a superseding indictment on the first indicted matter.  This indictment

2   charged Movant and his co-defendants with conspiracy in violation of 18 U.S.C. § 1371,

3   multiple counts of mail fraud in violation of 18 U.S.C. § 1341, multiple counts of wire fraud in

4   violation of 18 U.S.C. § 1343, conspiracy to commit money laundering in violation of 18 U.S.C.

5   § 1956(h), and money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i).  (document #

6   258) The charges were based on allegations of deceptive telemarketing activities conducted

7   through American Eagle Advertising ("AEA" or "American Eagle") in Phoenix, Arizona and

8   Atlanta, Georgia.

9       Trial commenced on July 15, 1998.  At the close of the government's case, Movant

10  and his co-defendants jointly  moved to dismiss eight counts of wire fraud, counts 22, 25-28,

11  and 30-32, for lack of venue. (documents # 607, # 617) The district court denied the motion

12  finding that the defendants had waived any objection to venue.  Thereafter, on November 12,

13  1998, the jury returned its verdict.  (document # 482, 655) The jury found Movant guilty of the

14  following charges: one count of conspiracy; 15 counts of mail fraud; 13 counts of wire fraud;

15  one count of conspiracy to commit money laundering; and 11 counts of promotional money

16  laundering.  (document # 655) On August 2, 1999, the district court sentenced Movant to 365

17  months imprisonment followed by 36 months supervised release and ordered him to pay $8.7

18  million in restitution.  (document # 875);(Tr. 8/2/1999 at 27-30) Movant filed a direct appeal

19  and on July 12, 2002, the Ninth Circuit affirmed Movant's conviction and sentence in United

20  States v. Johnson, 297 F.3d 845 (9th Cir. 2002).  (document # 1145)  Movant's petition for writ

21  of certiorari was denied on March 3, 2003 in Johnson v. United States, 537 U.S. 1242 (2003).

22      Thereafter, Movant filed a Motion to Vacate, Set Aside, or Correct Sentence

23  pursuant to 28 U.S.C. § 2255 (document # 1169) which the court dismissed with leave to amend

24  within thirty days using the court-approved form.  (document # 1172)  Movant subsequently

25  filed a § 2255 Motion on the proper form.  (document # 1176) Movant also filed motions for

26  discovery and an evidentiary hearing.  (document # 1173, # 1174, respectively)

27

28

Thereafter, Movant filed several supplemental pleadings which the Court disposed of on January 20, 2005. (document # 1260 adopting Report and Recommendation, document # 1252) The Court will not revisit the issues addressed in the January 20, 2005 Order.

Most recently, the Court permitted Movant to Amend his § 2255 Motion to add a claim that appellate counsel was ineffective for failing to challenge Movant's sentence under Apprendi v. New Jersey, 530 U.S. 466 (2000). (document # 1290, document # 8/16/05 Order) The Court also ordered that:

> Movant's Amended Motion shall not include any claims not previously asserted in his original § 2255 Motion. Any attempt to expand his claims beyond the limits in this Order may result in the Court's refusal to consider the Amended pleading.

(document # 1290)   Thereafter, Movant filed an Amended § 2255 Motion and Supplemental Memorandum. (documents # 1310, # 1311) Despite the Court's Order, the Amended Motion includes several factual and legal arguments not previously asserted in the Original Petition (documents # 1176, # 1310, # 1311).   The Court will point out these new arguments throughout the text of the Report and Recommendation.   Respondent has responded to the Amended Motion (document # 1316) and Movant has filed a Reply.  (document # 1317) Accordingly, Movant's Amended § 2255 Motion is ready for review.

## FACTUAL BACKGROUND

### I. History of Telemarketing Activities

The events giving rise to Movant's conviction began in Atlanta in 1995 where Movant and co-defendant Micah Rudisill operated a telemarketing business named American Eagle Advertising which sold promotional items such as magnetic business cards, coffee mugs, and key chains. (Tr. 7/21/1998 at 439; Tr. 9/22/1998 at 4579) Defendants solicited elderly individuals. (Tr. 9/24/1998 at 5075) At the end of 1995, Movant relocated to Phoenix, Arizona and opened a "front" office for American Eagle's Atlanta operation. (Tr. 7/21/1998 at 477, Tr. 9/22/1998 at 4587) Defendant Rudisill remained in Atlanta and supervised American Eagle's telephone solicitors/reloaders. (Tr. 8/25/1998 at 3276; Tr. 9/29/1998 at 5198)

## II. "Qualifying" Victims

The American Eagle scheme operated on the premise that if a customer was "hooked" once, they could be "reloaded" for increasing amounts of money. (Tr. 9/24/1998 at 5082) In order to "hook" customers, solicitors from American Eagle's Atlanta office telephoned potential customers and informed them that they were being called by a "rewards coordinator" from a "rewards center" because they were "one of a fortunate few" who had been selected as a finalist in a "Million Dollar Bonanza" and that an executive committee would soon be determining "who will be approved for participation to receive our fabulous bonuses." (Tr. 8/19/1998 2869, 2873-76; Tr. 9/29/1998 at 5136-39)   American Eagle telephone solicitors (including co-defendants Gene Burce, Louise Clark, Michael Davis, and Harry Johnson) lied to prospective customers about their identity, from where the sales call originated, the purpose of the call, and the customer selection process.   The purpose of the qualifying  process was to identify individuals who could be persuaded to send money to American Eagle. (Tr. 8/19/1998 at 2877; Tr. 9/29/1998 at 5139) In general, American Eagle solicitors in the Atlanta office only qualified individuals age 60 or older.  (Tr. 8/19/1998 at 2885; Tr. 9/29/1998 at 5143) Such individuals were more likely to send money to American Eagle especially if they were retired and lived alone.  (Tr. 9/29/1998 at 5141; 5143-44)

## III.  Initial Sale

After qualifying a prospective customer, the solicitors (Movant, Burce, Clark, Davis, and Johnson) used a "front pitch" to convince that individual to send money to American Eagle. (Tr. 9/29/1998 at 5153, 5174) Solicitors told the victims that they were "absolutely guaranteed and must receive" prizes ranging from a truck to an "investment level portfolio" of gold coins. (Tr. 8/19/1998 at 2896; Tr. 9/29/1998 at 5155)  The solicitors then explained that American Eagle was in the business of selling promotional items to small businesses.  Therefore, an individual could not receive a prize, unless he or she was identified as a business and purchased promotional items such as clocks and pens.  (Tr. 8/19/1998 at 2891-93, Exh. 950) The solicitors told the individuals that they could create a fake business name related to their interests or hobbies (e.g. Alice's crafts and gifts).  (Tr. 9/24/1998 at 5100; Tr. 10/6/1998 at 5795) If the

1   customer did not want the promotional items, American Eagle solicitors offered to donate the
2   promotional items, or their equivalent value, to charity.  (Tr. 8/19/1998 at 2784; Tr. 8/20/1998
3   at 3035-39) However, American Eagle only donated approximately 2% of the victims' purchases
4   to charity. (Tr. 9/23/1998 at 4751-52)

5          If an individual purchased promotional items, the solicitors instructed that individual
6   to mail a check to American Eagle's Phoenix office.  (Tr. 8/19/1998 at 2910-11)   The Atlanta
7   solicitors then faxed the sales orders to the Phoenix office.  (Tr. 8/19/1998 at 2917-18, Tr.
8   8/20/1998 at 3024; Tr. 9/29/1998 at 5151-52) After the Phoenix office received the check, a
9   caller from the Phoenix office would telephone the customer and tape record a conversation
10  "verifying" the purchase of promotional items.  (Tr. 7/23/98 at 767-68; Tr. 9/29/1998 at 5152)

11  **IV.  "Reload" Sales**

12          In early 1996, the "reloader defendants" (Burce, Davis, Clark, and Johnson) began
13  making follow-up calls to individuals who had been successfully "fronted."  (Tr. 9/29/1998 at
14  5117-5118, 5170-73) In May of 1997, Ricardo Simone also began making reload sales for
15  American Eagle.  The "reloaders" usually told customers that they had advanced to a higher
16  prize level and that if they sent more money to American Eagle, they would receive their "fair
17  share" of $500,000 or a more valuable prize including gold coins. (Tr. 8/19/1998 at 2950)

18          For example, reloader Burce told  Nelwyn Martin and Roberta Dixon that they
19  should send money to get their fair share of $500,000 in gold.  (Tr. 8/27/98 3832; Tr. 9/1/98
20  3952) In explaining the difference between front sales and reloading, Richard Simone testified
21  that "[i]n the front sale, [customers are] told that they're going to receive one of the three major
22  rewards.  In the reload, we tell them that was liquidated into over a half of million dollars in
23  gold, and they've been selected again to receive a share of that half of million dollars in gold."
24  (Tr. 8/19/98 2959)   During the relaoders daily sales meeting, pitch books and leads were
25  distributed, reloaders were urged to increase sales efforts, and the most successful reloaders
26  were awarded prizes.  (Tr. 8/25/98 3345, 3351)

27          The reloaders also passed their victims to each other.  If a victim was reluctant to
28  send more money to American Eagle, another reloader would take over and often succeeded in

making a sale.  (Tr. 8/26/98 3636-37) Victim testimony established that different reloaders successively contacted the victims.  For example, John Panian was reloaded by defendants Johnson, Clark, and Burce.  (Tr. 10/7/98 5865, 5869) Similarly, Martha Biggs and Drusila Aden, were contacted successively by each of the four reloader defendants. (Tr. 9/15/98 4324, 4334, 4355; Tr. 10/6/98 5805, 5808, 5812, 5734)  The reloader defendants used the previous sales order forms as leads in making sales calls.  (Tr. 8/19/98 3022-23, 3044; Tr. 8/26/98 3517) These sales forms included a history of the dates and amounts of previous sales and the hard gifts that had been sent to the victim.  (Tr. 8/19/98 3022; 8/26/98 3517) Each victim's front sale was identified as "EAG 710"; subsequent reloads were numbered EAG 1420, EAG 1520, et cetera. (Tr. 7/23/98 936-37) When another sale was made, the reloader completed a new form that included the previous sales history.  (Tr. 8/19/98 3023-24) Because the reloader defendants used a prior sales order as a lead in making the next reload sales, they knew their victims had been sold repeatedly.  After completing a sale, the reloaders gave the order form to defendant Rudisill, who determined the "hard gift", usually small amounts of gold or gold coins, to give the customer.  (Tr. 8/19/1998 at 2921; Tr. 8/20/1998 at 3033; Tr. 9/29/1998 at 5165)

As with the initial sale, after the Phoenix office received the check, a caller from the Phoenix office would telephone the customer and tape record a conversation "verifying" the purchase of promotional items.  The reloaders coached the customers in advance about what to say during the verification call. (Tr. 10/15/1998 at 6498, Exhs. 114, 116B) Defendant Eames oversaw the verification process in Phoenix.  (Tr. 7/29/1998 at 1237-38) He instructed co-defendant Teresa Eames to record a "clean" verification call for each customer confirming the purchase, as a business, of advertising items and the customer's agreement that American Eagle would donate the items to charity.  (Tr. 7/28/98 at 957, 1008-09; Tr. 1237-38) If the customer became uncooperative,  Teresa Eames notified Rudisill in Atlanta and the solicitors would contact the customer to rehearse the verification call again.  (Tr. 8/5/1998 at 1573, 1567; Tr. 9/29/1998 at 5151-53) If a customer grew reluctant to send money to American Eagle, defendant Rudisill would assign a different reloader to that customer.  (Tr. 8/26/1998 at 3517)

1        To conceal American Eagle's operations, Defendant Rudisill instructed the reloaders

2   to dial *67 before calling to prevent customers from tracing their calls, directed that messages

3   regarding communications from the Phoenix office about customers be shredded, directed the

4   reloaders to return their leads and pitch books to Rudisill at the end of the day, and instructed

5   the reloaders to leave fake "pitch books" and Dunn & Bradstreet leads in the office.  (Tr.

6   8/19/1998 at 2842, 2859; Tr. 8/20/1998 at 3189; Tr. 8/25/1998 at 3265, 3267; Tr. 8/26/1998 at

7   3525; Tr. 9/29/1998 at 5181, 5184-86, 5190-91) Additionally, the reloaders used aliases (Tr.

8   8/19/1998 at 2831-33), falsely told customers that they were calling from Phoenix,  and did not

9   give out the Atlanta telephone number or address for American Eagle.  (Tr. 8/20/1998 at 3189)

10  The reloaders also used aliases to place the sales orders, used the customer's false "business"

11  names, recorded the customers' telephone numbers in code, and understated the sales amounts

12  by omitting the last zero (for example a $5,000 sale was recorded as $500).  (Tr. 8/20/1998 at

13  3020-21; Tr. 9/29/1998 at 5149-51)

14  **V.  Extent of the Fraud**

15       From January 1996 to June of 1997, Defendants obtained over $10 million from

16  their telemarketing activities.  (Tr. 6/28/1999 at 77) They used a large portion of the proceeds

17  to further the scheme.  For example, Defendants purchased more than $1.5 million in gold for

18  "hard gifts" and premiums for customers. (Tr. 9/1/1998 at 3980, Exh. 460) They also spent

19  $141,000 on promotional items from Executive Industries.  (Tr. 9/22/1998 at 4674-75, Exhs.

20  1152, 1153) Movant sent money orders and cash to defendant Rudisill weekly to pay the

21  solicitors' and reloaders' commissions.  (Tr. 9/29/1998 at 5195) Eames sent over $1.6 million

22  by money orders and also shipped cash to defendant Rudisill.  (Tr. 8/12/1998 at 2393-94; Tr.

23  9/23/1998 at 4756, 4761, 4791, 4843-44)

24       Based on the foregoing activities, Movant was convicted of numerous counts of

25  fraud, conspiracy and money laundering.  Movant challenges his conviction and sentence in the

26  pending Amended § 2255 Motion.

27

28

# ANALYSIS

In his Amended § 2255 Motion (document # 1310), Movant raises the following claims: (1) trial counsel was ineffective in failing to timely challenge venue as to Counts 22, 25-28, and 30-32; (2) appellate counsel was ineffective in failing to challenge the trial court's denial of Movant's motion for a mistrial and motion to strike based on perjured testimony of three cooperating government witnesses and for failing to challenge various instances of prosecutorial misconduct; (3) trial counsel was ineffective in failing to review discovery, failing to investigate, failing to introduce evidence and witnesses favorable to the defense, and failing to impeach government witnesses; (4) trial counsel was ineffective during sentencing and appellate counsel was ineffective for failing to challenge trial counsel's errors; (5) appellate counsel was ineffective for failing to challenge Movant's sentencing enhancements under Apprendi v. New Jersey, 530 U.S. 466, 490 (2000); and (6) appellate counsel was ineffective in failing to challenge the restitution order. (documents  # 1310, # 1311)   The Court will address these claims below.

## I. Venue on Eight Counts of Wire Fraud

In his first ground for relief, Movant contends that trial counsel was ineffective for failing to timely move for the dismissal of eight counts of wire fraud (counts 22, 25-28, and 30-32) based on a lack of venue.  (document # 1310 at 7) Although counsel did challenge the Court's venue over these counts, he did not do so until after the government had rested.  The district court concluded that although there was no venue in Arizona for counts 22, 25-28, and 30-32, Movant and his co-defendants had waived any objection to venue by waiting to raise that issue until after the government rested its case.  (Tr. 10/21/1998 at 6742-43) The Ninth Circuit affirmed the trial court's ruling. Johnson, 297 F.3d at 860.

To establish ineffective assistance of counsel, Movant must establish that  (1) counsel's representation fell below an objective standard of reasonableness; and (2) he was prejudiced thereby.  Hill v. Lockhart, 474 U.S. 52 (1985)(citing Strickland v. Washington, 466 U.S. 668, 688-692 (1984)).  To establish prejudice, petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have

1  been different." Strickland, 466 U.S. at 694.  Where the petitioner cannot establish prejudice,

2  the court need not reach the performance prong.  Strickland, 466 U.S. at 697; Williams v.

3  Calderon, 52 F. 3d 1465, 1470 (9th Cir. 1995).

4  **A.  Whether Counsel's Failure to Challenge Venue Prejudiced Movant**

5  Movant claims that "[v]enue was a disputed and critical issue" in his case and "that

6  the results of his conviction and sentence would [have been] different had his trial counsel

7  timely raised this issue . . . ."  (document # 1311 at 8)  Even assuming that trial counsel's

8  performance was deficient in failing to timely challenge venue, Movant's claim of ineffective

9  assistance fails because he has not established prejudice.  The jury found Movant guilty of one

10  count of conspiracy, fifteen counts of mail fraud, thirteen counts of wire fraud, one count of

11  conspiracy to commit money laundering, and eleven counts of promotional money laundering.

12  The dismissal of eight counts of wire fraud would not have impacted Movant's ultimate

13  conviction and sentence.  Excluding the challenged eight counts of wire fraud, Movant was

14  convicted of thirty-three counts.  Any two of the money laundering counts alone would have

15  supported the 365-month sentence which the Court imposed in this case.  Specifically, the Court

16  relied on counts 38 and 47 in sentencing Movant.  (document # 875)  Both counts 38 and 47

17  charged Movant with money laundering offenses in violation of 18 U.S.C. § 1956(h) and §

18  1956(a)(1)(A)(i), respectively.  (document # 258)   Thus, the challenged eight counts of wire

19  fraud counts did  not contribute to the length of Movant's sentence because they ran

20  concurrently with the other thirty-three counts of conviction.

21  Accordingly, Movant fails to establish that the results of the trial and sentencing

22  would have been different had trial counsel timely challenged venue as to eight counts of wire

23  fraud.  Strickland, 466 U.S. at 697.

24  **B.  Trial Counsel's Performance**

25  Although the Court finds that Movant fails to establish prejudice as a result of trial

26  counsel's failure to timely challenge venue as to eight counts of wire fraud, the Court will also

27  consider the performance prong of Strickland.  Strickland, 466 U.S. at 697. "Judicial scrutiny

28  of counsel's performance must be highly deferential," and courts "must indulge a strong

- 9 -

1  presumption that counsel's conduct falls within the wide range of reasonable professional

2  assistance." Id. at 689.  In reviewing a claim of ineffective assistance, the court should take care

3  not to "secondguess[] a lawyer's trial strategy. . . ." Johnson v. Lockhart, 921 F.2d 796, 799 (8th

4  Cir. 1991).

5  　　　　Here, six criminal defense attorneys pursued the same strategy of waiting until after

6  the prosecution rested its case to challenge venue on eight counts of wire fraud.  Defense

7  counsel argued that venue could not be properly assessed until the close of the prosecution's

8  case-in-chief because the case involved numerous counts and complicated facts which made it

9  unclear how the prosecution planned to establish that venue was proper in Phoenix.  (Tr.

10  10/21/1998 at 6605, 6676, 6703-6707, 6696)    The district court rejected that argument.

11  However, that argument still constitutes a reasonable strategic decision that this Court should

12  not secondguess. Johnson, 921 F.2d at 799.  Additionally, had counsel challenged venue before

13  trial, the prosecution could have filed a superseding indictment to include other wire fraud

14  counts over which the Arizona district court had proper venue.  All six defense counsel

15  determined that it was worth the risk of waiting until after the prosecution rested to challenge

16  venue because if the challenge succeeded, it would have been too late for the prosecution to

17  allege additional counts of wire fraud.  This was a reasonable strategic decision and does not

18  constitute deficient performance under Strickland. 466 U.S. at 689.  The decision regarding

19  when to challenge venue involved weighing the risks of pursuing such a strategy.  "Such

20  weighing should not be labeled ineffective assistance merely because the choice of strategy has

21  been unsuccessful." Matthews v. Evatt, 105 F.3d 907, 918 (4th Cir.1997)(citing Strickland, 466

22  U.S. at 689).  The Court finds that, under "highly deferential" scrutiny, counsel did not make

23  "errors so serious that [he was] not functioning as the counsel guaranteed by the Sixth

24  Amendment." Strickland, 466 U.S. at 697.   Accordingly, Movant's claim fails.

25  **II.    Ineffective Assistance - Failure to Challenge Denial of Motion to Strike Testimony of Three Witnesses**

26

27  　　　　In his second ground for relief, Movant contends that his two appellate attorneys,

28  Philip Seplow and John Rood, III, were ineffective in failing to appeal the trial court's denial

1    of defense counsel's motion to strike the testimony of three cooperating government witnesses,

2    Teresa Eames, Ricardo Simone, and Rebecca Setzer.   (document # 1311 at 11) Movant also

3    claims that his appellate attorneys were ineffective in failing to appeal several incidents of

4    prosecutorial misconduct.  (Id.)

5           To establish ineffective assistance of counsel, Movant must establish that (1)

6    counsel's representation fell below an objective standard of reasonableness; and (2) he was

7    prejudiced thereby.   Hill v. Lockhart, 474 U.S. 52, 56-58(1985)(citing Strickland v.

8    Washington, 466 U.S. 668, 688-692 (1984)).  To establish prejudice, movant must demonstrate

9    "a reasonable probability that, but for counsel's unprofessional errors, the result of the

10   proceeding would have been different." Strickland, 466 U.S. at 694.  Where the movant cannot

11   establish prejudice, the court need not reach the performance prong.  Strickland, 466 U.S. at

12   697; Williams v. Calderon, 52 F. 3d 1465, 1470 (9th Cir. 1995). In other words, if the movant

13   fails to allege specific facts showing prejudice, the reasonableness of counsel's representation

14   is inconsequential.   Hill v. Lockhart, 474 U.S. 52, 60 (1985).   In reviewing counsel's

15   performance, the court "strongly presume[s] that counsel's conduct was within the wide range

16   of reasonable assistance, and that he exercised acceptable professional judgment in all

17   significant decisions made."   Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1989)(citing

18   Strickland, 466 U.S. at 689).  In assessing attorney performance, the court must make "every

19   effort . . . to eliminate the distorting effects of hindsight. . . ." Iaea v. Sunn, 800 F.2d 861, 864

20   (9th Cir. 1986).  Trial counsel's "strategic choices made after thorough investigation of law and

21   facts relevant to plausible options are virtually unchallengeable . . . ." Strickland, 466 U.S. at

22   690-91.  As such, it is not ineffective assistance to fail to raise an argument that defense counsel

23   reasonably concludes would not be successful.  Hamilton v. Vasquez, 17 F.3d 1149, 1164 (9th

24   Cir. 1994)(stating that trial counsel did not render ineffective assistance where he failed to raise

25   an argument which trial counsel could have reasonably concluded would not have persuaded

26   the jury.)

27           To prevail on a claim of ineffective assistance of appellate counsel, movant must

28   show that counsel's representation fell below an objective standard of reasonableness and that

- 11 -

1   but for counsel's errors, he would have prevailed on appeal.  <u>Miller v. Keeney</u>, 882 F.2d 1428,

2   1434 (9th Cir. 1989).   Appellate counsel need not raise every non-frivolous issue requested by

3   defendant.  <u>Jones v. Barnes</u>, 463 U.S. 745, 751-54 (1983).  Counsel's failure to raise an issue

4   on appeal does not constitute ineffective assistance if the issue was not reasonably likely to

5   succeed.  <u>Morrison v. Estelle</u>, 981 F.2d 425. 427-28 (9th Cir. 1992).  Based on the foregoing

6   standards, the Court will determine whether appellate counsel rendered ineffective assistance.

**A.  Testimony of Teresa Eames**

8        Before Movant's trial, his ex-wife, Teresa Eames, pleaded guilty to three felonies

9   in both the first and second indictments in this case which charged her with conspiracy, mail

10  fraud and wire fraud.  (Tr. 7/21/1998 at 467, Tr. 8/12/1998 at 2381-82) Ms. Eames testified for

11  the prosecution at Movant's trial.   Movant claims that she committed perjury while testifying

12  under the influence of drugs and alcohol.  (document # 1310 at 12)

13       Ms. Eames was the government's first witness and she testified for more than the

14  first month of trial.  During the third day of her testimony,  defense counsel hired a private

15  investigator to follow Ms. Eames during the lunch break.  (Tr. 7/23/1998 at 846, 883-90)  The

16  investigator sat near Eames during lunch and saw her drink an alcoholic beverage.  (<u>Id.</u>)  During

17  that afternoon's  testimony, defense lawyers brought to the court's attention that Ms. Eames's

18  speech was slurred.  (Tr. 7/23/1998 at 841)  Accordingly, later that afternoon, the district court

19  held an evidentiary hearing, outside of the jury's presence, to determine whether Ms. Eames was

20  under the influence of alcohol or drugs.  During that hearing, Ms. Eames, who was under oath,

21  denied having consumed either alcohol or medication that day. (Tr. 7/23/1998 at 844-45)

22  However, based on the investigator's testimony, the court ordered Ms. Eames to take a drug test

23  through Pretrial Services.  (Tr. 7/23/1998 at 890) The drug test was negative.  (Tr. 7/28/1998

24  at 914-15)

25       Before trial resumed the following week, Ms. Eames informed the prosecution that

26  she had lied to the court about not drinking at lunch. (Tr. 7/28/1998 at 915-16) The prosecution

27  relayed this information to the court which again conducted a hearing outside of the jury's

28  presence.  Ms. Eames admitted having lied under oath and told the court that she had consumed

1  alcohol during lunch the previous week and that she had also taken medication. (Tr. 7/28/1998

2  at 915-16, 927-32) The next day, the prosecution informed the jury of the foregoing

3  circumstances surrounding Ms. Eames' testimony including her lies to the court. (Tr. 7/28/1998

4  at 927-31) Ms. Eames admitted that she had lied to court under oath about consuming alcohol

5  and taking medication.  (Id.)  On cross-examination, defense counsel impeached Ms. Eames

6  with evidence of her lies under oath.  (Tr. 8/13/1998 at 2431-32, 2442-47, 2612-12; Tr.

7  8/18/1998 at 2716-2724) Defense counsel also impeached Ms. Eames based on her drug usage,

8  tax fraud, and any benefit she might have received as a result pleading guilty and cooperating

9  with the prosecution. (Tr. 8/13/1998 at 2434-24, 2427-2431, 2439, 2614; Tr. 8/18/1998 at 2675-

10  76, 2686-2696)

11       Movant argues that the court should have stricken Ms. Eames' testimony because

12  it "lacked the required indicia of reliability."  In support of this claim, which Movant also

13  asserted in his original § 2255 Motion (document # 1176), Movant cites Napue v. Illinois, 360

14  U.S. 264, 269 (1959) where the Supreme Court reaffirmed an earlier holding that a conviction

15  obtained through the use of false evidence, known to be such by representatives of the State,

16  must fall under the Fourteenth Amendment."  Id. (citing Mooney v. Holohan, 294 U.S. 103

17  (1935)).  The Court also held that the same is true when the State, although not soliciting false

18  testimony, allows it to go uncorrected.    Alcorta v. State of Texas, 355 U.S. 28 (1957). The

19  Supreme Court in Napue further held that

20            [t]he principle that a state may not knowingly use false evidence, including
              testimony, to obtain a tainted conviction . . .does not cease to apply
21            merely because the false testimony goes only to the credibility of the witness.
              The jury's estimate of truth and reliability of a given witness may well be
22            determinative of guilt or innocence, and it is upon such subtle factors as
              the possible interest of the witness in testifying falsely that a defendant's life
23            or liberty may depend.

24  Napue, 360 U.S. at 269.

25       At petitioner's murder trial in Napue, the key state witness, who was then serving

26  a 199-year sentence for the same murder, testified that he had not received any benefit in

27  exchange for his testimony that petitioner had committed the murder.  Napue, 360 U.S. at 265.

28  Contrary to the witness's testimony, an Assistant State's Attorney had promised him that in

1  exchange for his testimony against petitioner, the State would recommend a reduced sentence.

2  Id. at 266.  When the witness was testifying at trial, the prosecutor knew that his testimony was

3  false but did nothing to correct it. Id. After petitioner's conviction, he discovered the deal that

4  the State had offered the principal witness and sought post-conviction relief.  Relief was denied

5  and petitioner ultimately sought review in the Supreme Court.  The Supreme Court held that

6  petitioner's conviction violated due process because it was obtained through the use of false

7  testimony, of which the State was aware and failed to correct.  Id.  The Court noted that the

8  witness testified that he did not receive any benefit from the State.  Id. at 270.  Had the jury

9  been told the truth, it might have concluded that the witness falisified his testimony to "curry

10 the favor of the very representative of the State who was prosecuting the case in which the

11 witness was testifying."  Id. at 270.

12         Unlike Napue, in this case, the prosecution did not know that Ms. Eames was lying

13 to the court about consuming alcohol and taking medication.  After Ms. Eames told the

14 prosecution that she had lied to the court, the prosecutor immediately informed the court.  The

15 court then conducted a hearing, outside of the jury's presence, during which Ms. Eames

16 admitted having lied under oath.  Thereafter, in the jury's presence, Ms. Eames admitted her lies

17 and was cross-examined about her conduct.  Thus, the prosecution acted timely to correct Ms.

18 Eames' false statement to the court.  Additionally, the jury was informed that Ms. Eames had

19 consumed an alcoholic beverage during lunch on the third day of her testimony and that she had

20 also taken medication that day.  The jury also learned that Ms. Eames had lied to the court about

21 her actions. Unlike the jury in Napue, the jury in this case was aware of the "true facts"

22 surrounding Ms. Eames' testimony.  Thus, because the prosecutor promptly acted to correct Ms.

23 Eames' lies to the court, the jury received complete information regarding the circumstances

24 surrounding Ms. Eames' testimony and her lies to the court and was able to assess Ms. Eames'

25 credibility.  Accordingly,  Movant was not denied due process.

26         Similar to Napue, the other cases which Movant cites involve situations where the

27 prosecutor knew of the false testimony, but either took no action or took delayed action to

28 correct it.  See Alcorta v. State of Texas, 355 U.S. 28 (1957)(finding that defendant was denied

- 14 -

1    due process in a murder trial where the defendant argued that he killed his wife in the heat of

2    passion when he caught her kissing another man who was also the only eyewitness where

3    prosecutor did not correct the only eyewitness's testimony that he was "just friends" with

4    defendant's wife); United States v. LaPage, 231 F.3d 488 (9th Cir. 2000)(holding that, in a

5    prosecution for making false statements to obtain a loan, prosecutor's knowing use of witness's

6    false testimony that he had recognized an accountant when she entered the courtroom during

7    a previous trial violated the defendant's right to due process where the accountant was a

8    "principal.").

9            In view of the foregoing, counsel's performance was not deficient in failing to

10   challenge the judge's decision not to strike Ms. Eames' testimony.  In view of the limited nature

11   of Ms. Eames' lie regarding her alcohol consumption during a break at trial, the fact that the lie

12   was timely brought to the attention of the court and the jury, and the fact that Ms. Eames was

13   cross-examined about the lie and her alcohol and drug use, it was not unreasonable for counsel

14   not to challenge the trial court's ruling.   Accordingly, Movant's claim of ineffective assistance

15   of counsel fails.  See Boag v. Raines, 769 F.2d 1341, 1344 (9th Cir.1985) (concluding that

16   failure to raise meritless arguments does not constitute ineffective assistance of counsel).

17           **B.  Testimony of Ricardo Simone**

18           Movant also challenges appellate counsel's failure to appeal the trial court's ruling

19   regarding the testimony of Ricardo Simone.  Defendant Simone was indicted in the second

20   matter.  Simone became a telemarketing reloader shortly before the first indictment was

21   returned.  He assisted Movant continue his telemarketing activities while he was on pretrial

22   release.  Simone testified regarding the nature and scope of the misrepresentations that the

23   solicitors made to American Eagle customers from the Atlanta, Georgia location.  Movant

24   challenges the veracity of Simone's testimony because he testified in exchange for leniency.

25   (document # 1311 at 13)

26           During the investigation of American Eagle's telemarketing activities, law

27   enforcement officers questioned Simone regarding American Eagle's operations in Atlanta and

28   Phoenix.  Movant contends that Simone lied to investigators about his "extensive criminal

1  history" and drug use.  (document # 1311 at 13)  Simone's lies to investigators were disclosed

2  during trial.  (Tr. 8/25/98 at 3376-77)

3          Movant further alleges that Simone's credibility was suspect because he had

4  attempted to change his name "to deceitfully obtain new credit."  (document # 1176 at 15)

5  Movant argues that Simone "is an individual of low moral character, whose testimony lack[ed]

6  any credibility whatsoever."  (Id.)  Movant contends that Simone committed perjury because

7  he lied to investigators before trial about his criminal history and because he had tried to change

8  his name under Washington state law.

9          The record does not support Movant's contention that Simone committed perjury

10  while testifying at Movant's trial.  Rather, Simone lied to police investigators before trial.  His

11  dishonesty was brought to the jury's attention which enabled the jury to assess Simone's

12  credibility.  Specifically, defense counsel cross-examined Simone about his attempted name

13  change, use of several aliases, and lies to investigators.  (Tr. 8/25/1998 at 3355-57, 3365-3373,

14  3409-3413, 3452-56; Tr. 8/26/1998 at 3533-58; Tr. 8/26/1998 at 3609-11, 3625, 3680) Simone's

15  lies to law enforcement officers before trial and his attempted name change did not support a

16  motion to strike his testimony.  Additionally, Simone was impeached about his criminal history,

17  drug usage, and potential benefit under the plea agreement.  (Tr. 8/19/1998 at 2800-2805, 2810-

18  13; Tr. 8/25/1998 at 3359-64, 3376-88; Tr. 8/26/1998 at 3542 -46, 3552-3561, 3586-89, 3606-

19  07)  Contrary to Movant's assertion, there is no evidence that Simone perjured himself during

20  Movant's trial.  Additionally, the jury was made aware of Simone's lies to the police and other

21  factors which impacted his credibility.  In view of the foregoing, counsel was not ineffective

22  in failing to argue that Simone's testimony should have been stricken.  Hamilton, 17 F.3d at

23  1164.

24          **C.  Testimony of Rebecca Setzer**

25          Movant next challenges appellate counsel's failure to challenge the trial court's

26  denial of the motion to strike the testimony of Rebecca Setzer, Eames' girlfriend.  (document

27  # 1176 at 16, # 1131 at 14)  Movant argues that the prosecutor instructed Setzer to withhold

28  exculpatory evidence "in the form of [American Eagle] bank statements showing checks issued

1   for customer refunds in the amount of $456,349.20 . . .  and checks issued on behalf of

2   [American Eagle] customers in the amount to $ 24,600.00 to various charities . . . ."  (document

3   # 1311 at 14; Tr. 9/24/1998 at 4921-4924, 4928-29)  Movant further claims that Setzer was

4   "coached by the government for 40 to 50 hours prior to trial."  (document # 1176 at 17;

5   document # 1311 at 14)

6         The record does not support Movant's claim that the prosecution instructed Setzer

7   to withhold exculpatory evidence.  (Tr. 9/24/1998 at 4921-22, 4954-4962, 4982, 4985-87)

8   Additionally, contrary to Movant's assertion that defense counsel unsuccessfully moved to strike

9   Setzer's testimony, the record reflects that defense counsel moved for a mistrial based on

10  Setzer's testimony.  (Tr. 9/24/1008 at 4954-55) Following a brief hearing, the trial court denied

11  the motion for mistrial.  (Tr. 9/24/1998 at 4961)  The record reflects that Setzer was confused

12  about the prosecution's request that she locate and review bank records.  (Id.)   There is no

13  evidence that the prosecution instructed Setzer to withhold exculpatory evidence or otherwise

14  improperly coached her.  Thus, there was no basis to strike Setzer's testimony or to grant a

15  mistrial based on her testimony.  Therefore, counsel was not ineffective in failing to appeal the

16  trial court's ruling regarding Setzer's testimony.  See Miller v. Keeney, 882 F.2d 1428, 1434 (9th

17  Cir.1989) (observing that appellate counsel does not have a constitutional duty to raise all

18  nonfrivolous issues).

19         **D.  Failure to Challenge Prosecutorial Misconduct**

20         In his Amended § 2255 Motion, Movant claims, for the first time, that appellate

21  counsel was ineffective in failing to appeal several incidents of prosecutorial misconduct.

22  (document # 1311 at 11-15) Movant challenges the prosecutor's conduct with respect to the

23  testimony of the three witnesses discussed in Section II. C, *supra*, and claims that the prosecutor

24  ignored the use of the "tainted testimony and corrupt concealment of exculpatory evidence."

25  (document # 1311 at 15)  In support of this claim, Movant cites a June 8, 2000 letter of trial

26  counsel, Philip Seplow.  (document # 1311 at 15, Exh.A)   In the June 8, 2000 letter, Mr.

27  Seplow advised Movant that:

28         [c]oncerning the prosecutorial misconduct, as a matter of fact, [there are]

at least five specific incidents of misconduct, which will be raised in the reloaders' brief to which, again, we are joined. If we are not satisfied with their arguments, I imagine we can petition the court on our own.

(Id.) Movant contends that this June 8, 2000 letter reveals that "counsel was aware of five incidents of prosecutorial misconduct, but failed to challenge one." (document # 1311 at 16) Movant concludes that he "has passed the test for prejudice" and his conviction should be set aside. (document # 1311 at 16) Movant does not establish how presenting the alleged incidents of prosecutorial misconduct on appeal would have changed the outcome of his appeal.

Moreover, as discussed in section II. C above, the testimony of Ms. Eames, Simone, and Sezter was thoroughly tested at trial and any "tainted testimony" was brought to the jury's attention. Additionally, there is no evidence to support Movant's claim that the prosecution improperly handled the testimony of Rebecca Setzer. Movant's claim of prosecutorial misconduct is conclusory and not supported by the record. Unsupported, conclusory allegations are not sufficient to support a claim for federal habeas relief, therefore, his claim fails. See Jones v. Gomez, 66 F.3d 199, 204-05 (9th Cir. 1995)(stating that conclusory allegations with no reference to the record or other evidence do not warrant habeas relief.)

**III. Ineffective Assistance of Counsel**

In his third ground for relief, Movant contends that trial counsel's performance was ineffective based on the following: (1) failure to review evidence; (2) failure to investigate and present a defense and loss of evidence; (3) failure to call as witnesses any of the lawyers and investigators that American Eagle hired after law enforcement officers searched the Phoenix and Atlanta locations; (4) failure to call as witnesses satisfied American Eagle customers or charitable representatives; and (5) failure to impeach victim Martha Biggs with testimonials she had made stating that she was satisfied with her dealings with American Eagle. Movant also contends that there was a "complete breakdown" in his relationship with trial counsel. (document # 1311 at 17)

**A. Failure to Review Evidence**

Movant contends that trial counsel was ineffective because he failed to review over 306 boxes containing "potential mitigating and exculpatory evidence." (document # 1311 at 17)

- 18 -

Specifically, Movant claims that counsel failed to review the following evidence: (1) evidence which the government obtained via search warrants and subpoenas; (2) three boxes of testimonials from American Eagle customers; (3) four boxes of records from Atlanta counsel, Lenny Franco; and (4) several boxes of business and legal records from American Eagle staff attorney Melvin McDonald.

### 1. Government Evidence

Movant claims that trial counsel failed to review evidence which the government had obtained via search warrants and subpoenas. In support of this claim, Movant contends that trial counsel Philip Seplow never signed the discovery log. (document # 1311 at 20, Exh. G) Although Philip Seplow did not sign the discovery log, his paralegal, Fred Ferguson, reviewed the evidence several times. (document # 1316 at 19) The record reflects that, contrary to Movant's assertion, counsel was aware of and reviewed the government's evidence.

### 2. Three Boxes of Testimonials

Movant further claims that trial counsel failed to review three boxes of discovery that contained testimonials from American Eagle customers. (document # 1311 at 19) Exhibit D attached to Movant's Memorandum is a memorandum from trial counsel to his paralegal which states that counsel spent the day with Movant in the Marshal's office reviewing the boxes which Movant now claims counsel never reviewed. (document # 1311, Exh. D) In view of the foregoing, Movant's claim that counsel failed to review the three boxes of testimonials lacks merit.

### 3. Four Boxes of Discovery from Atlanta Counsel

Movant further argues that counsel failed to review four boxes which contained records regarding a regulatory action brought by the State of Georgia against American Eagle for alleged violations of the Georgia Fair Business Practices Act. (document # 1311 at 19) Movant claims that evidence regarding the Georgia hearing would have exonerated him. (Id.) In support of this claim, Movant submits a letter from his former Atlanta counsel, Lenny Franco, which merely reiterates Movant's accusations. (Id., Exh. E)

During trial, none of the defense attorneys for Movant's co-defendants sought to introduce evidence regarding the regulatory hearing in Atlanta, Georgia.  Likewise, Movant does not claim that he sought to present evidence of the Georgia hearing during trial.  Moreover, Movant does not discuss the details of the Georgia regulatory hearing or how admitting such evidence would have changed the result of his trial.  He merely asserts that the boxes of records which Lenny Franco possessed "contained a vast amount of important [American Eagle] business records and valuable evidence used to overturn the action brought against [American Eagle] by the State of Georgia, for alleged violations of the Georgia Fair Business Practices Act."  (document # 1311 at 19) Movant claims that the introduction of such evidence "would most likely have established [his] innocence."  (Id.)  Movant's unsupported, conclusory allegations are insufficient to support a claim for federal habeas relief.  Jones v. Gomez, 66 F.3d 199, 204-05 (9th Cir. 1995)(stating that conclusory allegations with no reference to the record or other evidence do not warrant habeas relief.)

### 4.  Discovery from former Attorney Melvin McDonald

Movant also argues that trial counsel failed to review boxes of business records and legal files which American Eagle attorney Melvin McDonald sent to Movant.  (document # 1311 at 19) Movant claims that the records should have been used to support an "advice of counsel" defense.  Again, Movant does not provide any support for this claim and does not discuss how the materials would have impacted his trial.  Moreover, he presents evidence that trial counsel Philip Seplow received the documents from Mr. McDonald in 1998.  (document # 1311 at 20, Exh. F) Thus, trial counsel had the records from Mr. McDonald and there is no evidence in support of Movant's assertion that counsel did not review those records.  Movant's allegations are unsupported and conclusory and are insufficient to support a claim for federal habeas relief.  Jones v. Gomez, 66 F.3d 199, 204-05 (9th Cir. 1995)(stating that conclusory allegations with no reference to the record or other evidence do not warrant habeas relief.)

### B.  Lost Discovery/Testimonial Evidence

In addition to claiming that counsel failed to review certain evidence, Movant also claims that counsel lost numerous boxes of evidence.  In his original § 2255 motion, Movant

1  claimed that counsel lost three boxes of discovery containing testimonials.  (document # 1176)

2  Movant now expands that claim to assert that trial counsel lost four boxes of documents which

3  Atlanta counsel, Lenny Franco, transferred to trial counsel, and also lost the records that Melvin

4  McDonald, pre-indictment counsel, allegedly gave to trial counsel.  (document # 1311 at 19)

5           **1.  Lost Discovery**

6           Movant does not provide any support for his claim that counsel lost several boxes

7  of evidence which he obtained from Lenny Franco and Mel McDonad.  (document # 1311 at

8  19) Movant merely asserts that counsel either "lost" the evidence or that it "disappeared."  (Id.)

9  Movant does not describe the allegedly lost evidence or explain how it would have impacted

10 his trial.  Movant's unsupported and conclusory allegations are insufficient to support a claim

11 for federal habeas relief.  Jones v. Gomez, 66 F.3d 199, 204-05 (9th Cir. 1995)(stating that

12 conclusory allegations with no reference to the record or other evidence do not warrant habeas

13 relief.)

14           **2.  Testimonial Evidence**

15          Movant further claims that trial counsel lost three boxes which contained

16 testimonials from satisfied American Eagle customers.  (document # 1311 at 18)  In response

17 to Movant's claim, Respondent submits the affidavit of Philip Seplow stating that he did not lose

18 the three boxes of testimonials.  (document # 1316, Exh. 1) Moreover, even if counsel had lost

19 the three boxes of testimonial evidence, Movant was not prejudiced because the testimonials

20 because other evidence of the testimonials was admitted during trial.

21          At trial, the prosecution established that Movant and his co-defendants requested that

22 their customers create letters or testimonials in which they identified themselves as businesses

23 and expressed satisfaction with their dealings with American Eagle. These "testimonials" were

24 intended to help legitimize American Eagle.  (Tr. 8/12/1998 at 2241)  The prosecution

25 impeached the "testimonials" because they were created at the urging of American Eagle's

26 solicitors.  (Tr. 8/12/1998 at 2241) Additionally,  even if counsel lost the three boxes which

27 Movant claims contained "testimonials" from satisfied American Eagle customers, other

28 evidence was admitted regarding such  communications from American Eagle customers.  (Tr.

8/12/1998 at 2236-2240, Tr. 8/13/1998 at 2508-09, 2598, 2604, 2606, 2731-33)  Additionally, Movant does not describe any particular testimonial or affidavit that was allegedly lost or explain how any of the lost evidence differed from that which was introduced at trial. Accordingly, Movant cannot establish prejudice as a result of counsel's alleged loss of evidence and his claim fails.  <u>Strickland</u>, 466 U.S. at 694.

### C. Failure to Call Lawyers and Investigators as Witnesses

Movant further alleges that trial counsel was ineffective in failing to call as witnesses lawyers and private investigators that Movant had hired to review American Eagle's operations before the indictment but "after a search and seizure was executed by the government." (document # 1311 at 21)  Movant claims that these witnesses would have testified in support of an "advice of counsel" defense.

Movant states that he hired attorney Melvin McDonald to "examine the business practices of American Eagle and set up management guidelines. . . ." (document # 1311 at 21) Movant claims that McDonald would have testified that Movant invested a significant amount of money to ensure that American Eagle was run properly and that the Phoenix office was "clean." (<u>Id.</u>)  Movant argues that such testimony would have bolstered his credibility by establishing that he operated American Eagle according to counsel's advice.

Movant also states that he hired attorney Lenny Franco from Atlanta, Georgia before the indictment was issued.  He states that Franco would have testified that the Assistant United States Attorney in Atlanta was not interested in prosecuting American Eagle.  (document # 1311at 22)  Movant claims that several other individuals, David Arnell, Art Riege and Don Tucker, also would have testified that they had "worked on the case" and that the "Phoenix operation" was "clean."  (document # 1311 at 21, 23)

At trial, the cooperating witnesses testified that Defendants Rudisill and Eames did not permit the retained lawyers and investigators to conduct a complete investigation of American Eagle's Atlanta operation. (Tr. 8/18/1998 at 2738-2745, 2859, Tr. 8/20/1998 at 3164-67, 3267-3273, Tr. 8/23/1998 at 3437, 3440, Tr. 8/26/1998 at 3523, Tr. 9/29/1998 at 5182-86, 5190-91) Rather, the attorneys and private investigators only investigated the Phoenix office

1   which was a "front" for the Atlanta operations.  (Tr. 8/18/1998 at 2958; Tr. 8/20/1998 at 3189)

2   The Phoenix office sold promotional items to legitimate businesses while the Atlanta office

3   conducted fraudulent telemarketing activities.  (Tr. 9/24/1998 at 5090, 5099-5100)

4          The record reflects that the attorneys and investigators that American Eagle hired

5   were only given limited access to American Eagle's Atlanta operation.  (Tr 8/18/98 2738-2745,

6   2859; Tr. 8/20/98 3164-67, 3267-3273; Tr. 8/25/98 at 3437, 3440; Tr. 8/26/98 at 3525; Tr.

7   9/29/98 at 5182-86, 5190-91) Thus, the testimony of Mr. McDonald or the investigators would

8   have been detrimental to Movant's defense because it would have revealed that the American

9   Eagle attorneys and investigators were kept in the dark about the true nature of the Atlanta

10  operations.  Thus, presenting an advice of counsel defense would not advanced Movant's

11  defense.  Indeed, trial counsel informed Movant about the risks of pursuing an advice of counsel

12  defense and Movant agreed not to pursue such a defense.  (Seplow Aff., ¶ 3)  In view of the

13  foregoing, it was a reasonable strategic decision not  to present an advice of counsel defense

14  based on the testimony of American Eagle's investigators and lawyers. Strickland, 466 U.S. at

15  690-91 (stating that counsel's strategic decisions are virtually unchallengeable);  Johnson, 921

16  F.2d at 799 (stating that the court should not secondguess counsel's strategic decisions).

17          **D.  Failure to Call Charitable Representatives as Witnesses**

18          Movant further argues that trial counsel was ineffective in failing to call as witnesses

19  representatives from each of the nine charitable organizations to which American Eagle donated

20  money on behalf of American Eagle's customers. (document # 1311 at 18) Movant, however,

21  does not describe the nature of the testimony which these representatives would have offered

22  at trial.

23          Testimony at trial established that American Eagle did donate a small portion of its

24  proceeds to charity.  However, the record reflects that the charity which received the most

25  donations was operated by co-defendant Micah Rudisill's father and evidence established that

26  the charity was fraudulent.  (Tr. 7/29/1998 at 1254; Tr. 8/13/1998 at 2522; Tr. 8/20/1998 at

27  3038-39; Tr. 9/23/1998 at 4747-49) Thus, evidence regarding charitable donations would not

28  have been  beneficial to the defense.  Moreover, although representatives from the charities did

1  not testify, the jury heard evidence that American Eagle donated some of its proceeds to charity.

2  (Tr. 7/29/1998 at 1256-57; Tr. 8/12/1998 at 2264; Tr. 8/13/1998 at 2523-2526, 2591-94; Tr.

3  9/23/1998 at 4754-55; Tr. 9/24/1998 at 4889-4891) Thus, counsel's failure to offer additional

4  evidence of American Eagle's charitable contributions did not prejudice Movant.  Accordingly,

5  Movant fails to establish that trial counsel was ineffective in failing to present a witness from

6  the charitable organizations.

7  **E.  Failure to Impeach Martha Biggs**

8  Movant next argues that trial counsel rendered ineffective assistance in failing to

9  cross-examine a victim, Martha Biggs, regarding three "testimonials" that she submitted to

10  American Eagle in which she claimed to be a satisfied American Eagle customer.  (document

11  # 1311 at 26, Exh. Q)  Movant explains that "during the time period Mrs. Biggs was conducting

12  business with American Eagle Advertising, and before the indictment was filed, Mrs. Biggs and

13  her husband Lawrence provided three [n]otarized statements (what the company referred to as

14  testimonials) that clearly indicate that the Bigg[s] were reopening [their] Santa's Christmas

15  Shoppe, and were pleased with the products they received from American Eagle." (document

16  # 1176 at 25)  Movant contends that Mrs. Biggs' statements "are clearly mitigating and

17  exculpatory."  (Id.)   Contrary to her testimonials, Ms. Biggs testified at trial that she was an

18  "unhappy customer."  (document # 1311 at 26)

19  Ms. Biggs' testimonials to which Movant refers were not presented during Movant's

20  trial.  However, two similar letters were admitted at trial to impeach Ms. Biggs.  (Tr. 9/22/1998

21  at 4540, 4545) Defense counsel cross-examined Ms. Biggs about the inconsistency between her

22  letters praising American Eagle and her accusations of fraud at trial.  Ms. Biggs explained that

23  the she wrote the favorable letters at the urging of a reloader in order to maintain her status with

24  American Eagle during the alleged contest.  (Tr. 9/22/1998 at 4444)    Although the three

25  testimonials to which Movant refers were not presented at trial, evidence was introduced which

26  showed that Ms. Biggs posed as a business in her correspondence with American Eagle and that

27  she had expressed satisfaction with her dealings with American Eagle.  Thus, trial counsel was

28  not ineffective in failing to offer additional redundant evidence.

**F.  Relationship with Trial Counsel**

Movant further argues that there was a complete breakdown of the attorney-client relationship.  (document # 1311 at 20)  However, at sentencing, the Court asked Movant about counsel and Movant indicated that he was satisfied with his representation.

> The Court: Are you in any way dissatisfied with the service and representation you've received by your attorney, Mr. Seplow?
>
> The Defendant: No, your Honor.
>
> The Court: Has he represented you well?
>
> The Defendant:    Yes, ma'am.

(Tr. 8/2/1999) Thus, after trial and near the conclusion of sentencing proceedings, Movant advised the court  that he was satisfied with counsel's representation.  Because all of counsel's acts and omissions which Movant now challenges were known to Movant at the time of his sentencing, his claim that there was a complete "breakdown" in the attorney-client relationship is not credible.

**IV.  Ground Four - Sentencing Claims**

In the fourth ground for relief Movant claims that he was denied effective assistance of counsel during sentencing and that appellate counsel was ineffective in failing to challenge that ineffective assistance.  Specifically, Movant argues that counsel was ineffective in failing to: (1) argue that the imposition of consecutive sentences was without proper notice and was unreasonable (document # 1311 at 29); (2) failing to challenge the court's addition of one "grouping " point pursuant to U.S.S.G. § 3D1.4 to his sentencing calculation (document # 1311 at 31); and (3) in failing to challenge the disparity between his sentence and that of co-defendant Rudisill.[2] (document # 1311 at 32)

**A.  Consecutive Sentences**

Movant contends that trial counsel was ineffective in failing to challenge the lack of adequate notice that the court would impose consecutive sentences.  (document # 1311 at 29)

---

[2]  Movant did not raise this argument in his Original § 2255 Petition.  (document # 1176)

1    Movant was convicted of forty-two felony counts. The 365-month sentence imposed

2    did not exceed the statutory maximum for the counts of conviction because the trial court

3    imposed the maximum on Count 38 (240 months), to be served consecutively with the sentence

4    on Count 47 (125) months.  (Tr. 8/2/1999 at 27) The sentences on all other counts were to run

5    concurrently. (Id. at 23-30)

6    Movant claims that the imposition of consecutive sentences was unreasonable.

7    Pursuant to Guidelines § 5G1.2(d) and 18 U.S.C. § 3584(a), the court may impose consecutive

8    sentences on one or more counts in order to produce a combined sentence which equals the total

9    punishment Id.  Accordingly, the imposition of consecutive sentences did not violate the laws

10   of the United States.  Plaintiff has failed to establish that counsel was ineffective in failing to

11   object to Movant's consecutive sentences.

12   Movant further argues that the district court failed to give Movant adequate notice

13   of its intention to impose consecutive sentences.  Under § 2255, a defendant may challenge his

14   sentence on the grounds that it violates the Constitution or laws of the United States, or that the

15   court lacked jurisdiction to impose the sentence, or that the sentence exceeded the maximum

16   authorized by law.  28 U.S.C. § 2255.  Here, Movant's claim does not fall within the scope of

17   § 2255 and, therefore, is not cognizable on § 2255 review.

18   Moreover, Movant received adequate notice in this case. Federal Rule of Criminal

19   Procedure 32 provides that a district court can depart upwards only if the defendant received

20   notice that a departure is being considered and of the grounds on which the district court

21   departs.  Id.  Specific notice is required before the court can depart upward by imposing

22   consecutive sentences.  United States v. Brady, 928 F.2d 844, 847 (9th Cir. 1991), abrogated in

23   part on other grounds by Nichols v. United States, 511 U.S. 738 (1994).  The notice can come

24   from the presentence report or a prehearing submission from the government.  United States v.

25   Williams, 291 F.3d 1180, 1192 (9th Cir. 2002).

26   Here, the Presentence Investigation Report ("PSR"), put Movant on notice that his

27   recommended sentence was between 324 and 405 months.  (PSR at ¶ 80) The Probation

28   Department  recommended that the district court sentence Movant to 405 months and specified

1    that, "[t]his terms consists of 240 months on Count 38; and 165 months on Count 47 to be

2    served consecutive to sentence imposed on Count 38." (Id.)  Movant was given a copy of this

3    Sentencing Recommendation before sentencing.  Thus, Movant had sufficient notice of the

4    possibility that consecutive sentences would be imposed.    Williams, 291 F.3d at 1192.

5    Additionally, U.S.S.G. § 5GL.2(d) and 18 U.S.C. § 3584(a) permit the imposition of

6    consecutive sentences to produce a combined sentence that equals the total punishment.

7    Additionally, the PSR put Movant on notice that the Court could impose consecutive sentences.

8    Accordingly, Movant's claim fails.

9              **B.  Grouping**

10             Movant further argues that the court erred in adding one point to his guideline

11   calculation under U.S.S.G. § 3D1.4 and that counsel should have objected to the addition of that

12   point.  (document # 1311 at 32)

13             At sentencing, the district court considered Movant's objections to the PSR.  The

14   court determined that the money laundering offense level was 36, and the fraud offense level

15   was 28 (Tr. 8/29/99 at 11-14) To calculate the offense level for multiple counts, the district

16   court was required to add one point to the overall offense level pursuant to § 3D1.1-4 of the

17   Sentencing Guidelines.  U.S.S.G. § 3D1.4.  Thus, the court correctly added one point after

18   grouping and there was no basis for counsel to object.

19             **D.  Disparity between Sentences**

20             In his Amended § 2255 Motion, Movant argues for the first time that appellate

21   counsel was ineffective in failing to challenge the disparity between his sentence and that of co-

22   defendant Rudisill.  (document # 1311 at 32-33) Movant claims that there was "a substantial

23   disparity in sentences imposed" on Movant and co-defendant Rudisill "who were both alleged

24   to have engaged in the same criminal activity."  (document # 1311 at 32)

25             The district court determined that Movant's money laundering offense level was 36

26   and his fraud offense level was 28.  (Tr. 8/2/1999 at 11-19) The court added one point to the

27   combined offense level pursuant to U.S.S.G. § 3D1.4 making the total offense level 37 and

28   criminal history category IV.  (Id.)  Thus, Movant's sentencing range was between 292 to 365

1    months in prison.  The Court sentenced Movant to 240 months on Count 38 and 125 months on

2    Count 47, to be served consecutively to the sentence on Count 38.   Movant's sentences on the

3    other counts of conviction were to run concurrently with Movant's sentences on Counts 38 and

4    47.  (Id.)

5            During co-defendant Rudisill's sentencing hearing, the district court determined that

6    Rudisill's total offense level was 36 and criminal history was category II which resulted in a

7    sentencing range of 210 to 262 months in prison.  On August 6, 1999, the district court

8    sentenced Rudisill to a total of 210 months in prison based on his conviction in this case.

9    (document # 834; Tr. 8/6/99 at 19, 28) The court ordered that Rudisill's sentence run

10   consecutive to the 210-month sentence that Rudisill was already serving for his conviction in

11   another fraud prosecution from the Northern District of Alabama.  (document # 834, Tr. 8/6/99

12   at 28)

13           Movant claims that the district court erred in not explaining the reason for the

14   disparity between his sentence and that of co-defendant Rudisill.  "Absent an infringement of

15   defendant's constitutional right to stand trial, a district court judge is not required to explain the

16   basis for disparate sentences, within statutory limits, imposed upon similar codefendants."

17   United States v. Endicott, 803 F.2d 506, 510 (9th Cir.1986)(stating that "[a]bsent an

18   infringement of defendant's constitutional right to stand trial, a district court judge is not

19   required to explain the basis for disparate sentences, within statutory limits, imposed upon

20   similar codefendants");  United States v. Kohl, 972 F.2d 294, 300 (9th Cir.1992)("a sentencing

21   judge is under no obligation to equalize sentences among coconspirators or codefendants.") The

22   disparity between the sentences of Movant and co-defendant Rudisill does not violate Movant's

23   constitutional rights. United States v. Yarbrough, 852 F.2d 1522, 1545-46 (9th Cir. 1988)("[t]he

24   sentence imposed by a federal district judge, if within statutory limits, is generally not subject

25   to review").  As previously discussed on page 24, *supra*, Movant's sentence was within the

26   statutory range and there is no evidence that his right to stand trial was denied.  Moreover,

27   Rudisill's effective sentence was comparable to Movant's.  Because the court ordered that

28   Rudisill's sentence in the Phoenix case run consecutive to his Alabama sentence, the district

court effectively sentenced Rudisill to more time than Movant — 420 months compared to Movant's 365-month sentence.  Thus, Rudisill and Eames received comparable sentences. Moreover, even if the sentences are considered disparate, Movant's claim on this basis fails because the court was not required to impose similar sentences on co-conspirators.  Kohl, 972 F.2d at 300.  Because Movant's disparate-sentences claim lacks merit, counsel was not ineffective for failing to raise such an argument on appeal.  Hamilton, 17 F.3d at 1149.

## V.  Ground Five - Apprendi/Blakely/Booker Claims

In Ground Five, Movant argues that appellate counsel was ineffective for failing to challenge Movant's sentence under Apprendi v. New Jersey, 530 U.S. 466, 490 (2000).(document # 1311 at 34)  Movant argues that his sentencing factors including the amount of loss, role in the offense, and vulnerable victim enhancement, were required to be charged in the Indictment and found by a jury beyond a reasonable doubt.  (document # 1311 at 35) Movant also, for the first time, claims that his money laundering convictions are improper because the relevant jury instruction was erroneous.

### A.  Apprendi Claim/Ameline Finding

While Movant's direct appeal was pending in June of 2000, Movant requested that counsel supplement the appeal with a claim under Apprendi pertaining to (1) the money laundering calculation; (2) organizer enhancement; (3) vulnerable victim enhancement; and (4) restitution findings.  (document # 1311 at 35)  Movant wanted appellate counsel to argue that, for Apprendi purposes, these aggravating factors should have been charged in the Indictment, submitted to the jury, and proven beyond a reasonable doubt.  (Id.)  Although appellate counsel was aware of Movant's desire to raise an Apprendi challenge to his sentence, counsel did not present such a claim to the Ninth Circuit and the Ninth Circuit did not permit Movant to file a pro se brief raising an Apprendi claim.  (document # 1311 at 35-36)

Movant alleges that appellate counsel was ineffective because he did not challenge the application of the U.S.S.G. under Apprendi. Counsel's representation is ineffective if his performance falls below an "objective standard of reasonableness" and his deficient performance prejudiced the defense.  Strickland, 466 U.S. at 692-694.  The court must assess

the reasonableness of counsel's performance at the time of counsel's actions.  Id.  Movant's appeal was pending from 2000 to 2002, before the United States Supreme Court had decided either  Blakely v. Washington, 542 U.S. 961 (2004) or United States v. Booker, 543 U.S. 220 (2005).  Thus, at the time of Movant's appeal, the law in the Ninth Circuit was that the Apprendi rule did not apply to enhancements under the Sentencing Guideline.  United States v. Piers, No. A00-104-CR (HRH), 2005 WL 2786079, *9 (D.Alaska, October 21, 2005).  At the time of Movant's appeal, "[t]he Ninth Circuit had not held that Apprendi precluded the court from applying the Guidelines in the manner used in [Movant's] sentencing."  Id.  Thus, Movant is arguing that appellate counsel was ineffective for failing to make an Apprendi argument that would have been futile.   Indeed, at the time of Movant's appeal, the majority of counsel practicing in the federal system did not raise Apprendi objections to the use of the Sentencing Guidelines.  Piers, 2005 WL 2786079, * 9.  Thus, appellate counsel's conduct in this case was not unreasonable.  Id.  Rather, appellate counsel's failure to challenge the application of the U.S.S.G. to Movant was within the range of professional competence demanded of criminal attorneys, and therefore, does not constitute ineffective assistance of counsel.  Brown v. United States, 311 F.3d 875, 878 (8th Cir.2002) (failure to predict future developments of law regarding Apprendi like issues is not ineffective).

Respondent concedes that appellate counsel was aware of, and disregarded, Movant's desire to raise an Apprendi claim on direct appeal.  (document # 1316 at 29) Respondent suggests that Movant is entitled to the procedure outlined in  United States v. Ameline, 409 F.3d 1073, 1084 (9th Cir. 2005).

In Ameline, the Ninth Circuit held that when faced with an unpreserved Booker error that may have affected a defendant's substantial rights, and the record is insufficiently clear to conduct a complete plain error analysis, a limited remand to the district court is appropriate for the purpose of ascertaining whether the sentence imposed would have been materially different had the district court known that the sentencing guidelines were advisory.  Id. at 1084.

Thereafter, in United States v. Moreno-Hernandez, 419 F.3d 906, 916 (9th Cir.), cert. denied, 126 U.S. 636 (2005), the Ninth Circuit clarified that the limited remands provided

for in <u>Ameline</u> are available to defendants "in all pending direct criminal appeals involving unpreserved <u>Booker</u> error, whether [they] implicate the Sixth Amendment or just the nonconstitutional error that the sentence was imposed under guidelines believed to be mandatory]." <u>Moreno-Hernandez</u>, 419 F.3d at 916.   On remand, the district court is to determine whether the sentence would have been materially different if the district court had known that the Guidelines were advisory rather than mandatory. <u>Id.</u> at 1085. If the sentence would not have been materially different, the district court should retain the original sentence. <u>Id.</u>

Because the Ninth Circuit has held that a remand pursuant to <u>Ameline</u> is not retroactive to cases on collateral review, <u>Moreno-Hernandez</u>, 419 F.3d at 916, the Court disagrees with Respondent that affording Movant the procedure articulated in <u>Ameline</u> is required.  However, the Court finds it significant that Respondent proposed the <u>Ameline</u> procedure and recommends that, in an abundance of caution and in the interest of fairness, the District Court afford Movant the <u>Ameline</u> procedure.

However, Movant should only be afforded the limited process articulated in <u>Ameline</u> pursuant to which the United States District Judge who imposed Movant's sentence, in this case the Honorable Roslyn O. Silver, shall determine whether she would change Movant's sentence under the now-advisory sentencing Guidelines.  As discussed in detail below, the sentencing enhancements which Movant challenges in his Amended § 2255 Motion need not be found by a jury.  Because the challenged sentencing enhancements need not be found by a jury and the District Judge already found the sentencing factors under the proper standard of proof, Movant is not entitled to any relief beyond that prescribed in <u>Ameline</u>.

**B.  Sentencing After <u>Apprendi</u>, <u>Blakely</u>, and <u>Booker</u>**

In <u>Apprendi</u>, the Supreme Court held that any fact that increases a defendant's sentence beyond the statutory maximum, other than a prior conviction, "must be submitted to a jury, and proved beyond a reasonable doubt."  530 U.S. at 490.   Thereafter, in <u>Blakely v. Washington</u>, 542 U.S. 296, 125 S.Ct. 2531(2004), the Court extended the rule of <u>Apprendi</u> to a state statutory scheme that established sentencing ranges, but allowed for an "exceptional

sentence" above the standard ranges if the court found certain aggravating factors by a preponderance of the evidence. 542 U.S. at 300-301. According to <u>Blakely</u>, the relevant statutory maximum for <u>Apprendi</u> purposes was "the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." <u>Id.</u> at 303. As a result, the exceptional sentence which the state court had imposed in <u>Blakely</u>, which exceeded the statutory standard range, was deemed invalid because it was based on facts that had not been proven at trial or admitted by the defendant, even though the sentence was within the general statutory maximum for the conviction. <u>Id.</u> at 302-05.

After <u>Blakey</u>, the Supreme Court in <u>Booker</u> applied the principles announced in <u>Apprendi</u> and <u>Blakely</u> to the United States Sentencing Guidelines. <u>United States v. Booker</u>, 543 U.S. 220, 125 S.Ct. 738 (2005). In the first part of the <u>Booker</u> decision, the Court held that the Sixth Amendment jury trial requirement applies to the United States Sentencing Guidelines. 125 S.Ct. at 749-50. The Court's conclusion was based on the premise that the Sentencing Guidelines, like the sentencing scheme in <u>Blakely</u>, were "mandatory and impose[d] binding requirements on all sentencing judges." <u>Id.</u> Rather than invalidating the Guidelines, however, in the remedial part of the <u>Booker</u> decision, the Court made the Guidelines advisory by severing both the provision in the Sentencing Reform Act ("SRA") that made the Guidelines mandatory, 18 U.S.C. § 3553(b)(1), and an appellate review provision that presumed the Guidelines were mandatory, 18 U.S.C. § 3742(d). <u>Id.</u> at 756-57. In the wake of <u>Booker</u>, the district court must still consider the Guidelines in sentencing defendants, but may customize sentences to reflect the statutory sentencing objectives set forth in 18 U.S.C. § 3553(a).

### 1. Standard of Proof at Sentencing

Movant, relying on <u>Apprendi</u> and <u>Blakely</u>, argues that the sentencing factors must be proven beyond a reasonable doubt and that the district court erred in failing to use that standard when sentencing Movant. (document # 1311 at 37) Contrary to Movant's assertion, sentencing factors need not be proved beyond a reasonable doubt, therefore, the district court properly found those factors by a preponderance of the evidence.

In <u>Booker</u>, the majority rejected the dissenting Justices' proposal that would have amended the Sentencing Guidelines to include a jury fact-finding requirement.  <u>Booker</u>, 125 S.Ct. at 757, 799 (rejecting recommendation that "[r]ather than engage in a wholesale rewriting of the SRA, [the Court should] simply allow the Government to continue doing what it has done since this Court handed down <u>Blakely</u> — prove any fact that is <u>required</u> to increase a defendant's sentence under the Guidelines to a jury beyond a reasonable doubt.")(Stevens, J., dissenting)(emphasis in original).   The majority, however, concluded that grafting a jury fact-finding requirement onto the Guidelines would "destroy the [federal sentencing] system." <u>Id.</u> at 759-60.   The Court, therefore, changed the Guidelines from mandatory to advisory, but otherwise preserved the Guidelines.  <u>Id.</u> at 764.

Contrary to Movant's assertion, "<u>Booker</u> [did] not in the end move any decision from judge to jury, or change the burden of persuasion." <u>McReynolds v United States</u>, 397 F.3d 479, 481 (7th Cir.), <i>cert. denied</i>, ___ U.S., 125 S.Ct. 2559 (2005).  Rather, "[t]he remedial portion of <u>Booker</u> held that decisions about sentencing factors will continue to be made by judges, on the preponderance of the evidence, an approach that comports with the Sixth Amendment so long as the guideline system has some flexibility in application." <u>Id.</u>  Thus, "in sentencing criminal defendants for federal crimes, district courts are still required to consider Guideline ranges, which are determined through application of the preponderance standard, just as they were before."  <u>United States v. Magallanez</u>, 408 F.3d 672, 685 (10th Cir. 2005)(citation omitted).  After <u>Booker</u>, the only change is that the Guidelines are advisory instead of mandatory.  <u>United States v. Miller</u>, 417 F.3d 358, 363 (3rd Cir. 2005)(stating that "[n]othing in <u>Booker</u> causes us to retreat from our prior approval [in 2003] of the District Court's interpretation and application of the Guidelines to Miller's case (save, of course, the fact that the Court interpreted and applied the Guidelines as mandatory).");  <u>United States v. Lawrence</u>, 405 F.3d 888, 907 (10th Cir. 2005)(stating that "the Supreme Court's holding in Booker would not have prohibited the district court from making the same factual findings and applying the same enhancements and adjustments to [the defendant's] sentence as long as it did not apply the Guidelines in a mandatory fashion.").

Accordingly, the Ninth Circuit and other circuits have held that the preponderance of the evidence standard applies at sentencing after Booker.  In United States v. Dupas, 419 F.3d 916. 919 (9th Cir. 2005), the Ninth Circuit stated that," [t]he 'advisory guidelines' remedy gives the sentencing judge discretion to sentence outside the guideline range, but still allows the sentencing judge (as distinct from a jury) to make the findings of fact necessary to determine the guideline range in the first place."  See also, United States v. Kilby, No. 05-30112. 2006 WL 891044, at * 4 (9th Cir., April 7, 2006)(stating that factual disputes at sentencing are resolved by district judges by a preponderance of the evidence); United States v. Mix, No. 05-1088, 2006 WL 802535, * 7 (9th Cir., March 30, 2006)(stating that "the fact that the district court considered uncharged conduct in imposing a sentence of life imprisonment did not violate the Sixth Amendment.");  United States v. Antonakopoulos, 399 F.3d 68, 75 (1st Cir. 2005)(stating that "the Booker error is that the defendant's Guidelines sentence was imposed under a mandatory system.  The error is not that the judge (by a preponderance of the evidence) determined facts under the Guidelines which increased a sentence beyond that authorized by the jury verdict or an admission by the defendant; the error is only that the judge did so in a mandatory Guidelines system.");  United States v. Gonzalez, 407 F.3d 118, 125 (2nd Cir. 2005)(stating that the sentencing court's authority under the Guidelines to resolve disputed facts by a preponderance of the evidence survives Booker); United States v. Mares, 402 F.3d 511, 519 (5th Cir. 2005)(stating that post-Booker, "[t]he sentencing judge is entitled to find by a preponderance of the evidence all the facts relevant to the determination of a Guideline sentencing range and all facts relevant to the determination of a non-Guidelines sentence."); United States v. Gardner, 417 F.3d 541, 546 (6th Cir. 2005)(approving use of preponderance standard by judge to determine drug quantity enhancements under advisory Guidelines); United States v. Lee, 399 F.3d 864, 866 (7th Cir. 2005)(stating that the "upshot of [Booker] is to increase district judges' sentencing discretion rather than reallocate any issue from judge to jury, change the burden of persuasion, or limit sentences to those that can be supported solely by the facts found by the jury."); United States v. Bryant, 420 F.3d 652, 656 (7th Cir. 2005)("Bryant interprets Booker and its predecessor cases as requiring *all* factual determinations in sentencing to be proved beyond

a reasonable doubt.  We reiterate, however, that these cases do not foreclose judicial factfinding in the sentencing context, nor do they dictate that judges must find those facts beyond a reasonable doubt.")(emphasis in original); United States v. Pirani, 406 F.3d 543, 552 n. 4 (8th Cir. 2005)(stating that "[n]othing in Booker suggests that sentencing judges are required to find sentence-enhancing facts beyond a reasonable doubt under the advisory Guidelines regime.): cert. denied, 74 U.S.L.W. 3210 (2005); Magallanez, 408 F.3d at 684 (stating that "[b]oth before and under the Guidelines, facts relevant to sentencing have generally been found by a preponderance of the evidence . . . Nothing in Booker changes this analysis.); United States v. Duncan, 400 F.3d 1297, 1304-05 (11th Cir. 2005), cert. denied, ___ U.S.___, 126 S.Ct. 432 (2005)(reaffirming pre-Booker precedent permitting consideration of acquitted conduct at sentencing when supported by preponderance of the evidence because "nothing in Booker erodes our binding precedent.").

The Ninth Circuit's post-Booker decisions are consistent with the reasoning of the foregoing circuit court opinions.   In United States v. Dare, 425 F.3d 634 (9th Cir. 2005), the Ninth Circuit considered Booker's impact on mandatory minimum sentences under 18 U.S.C. § 924(c).  The court reaffirmed that the preponderance standard still applies at sentencing after Booker.  Id. at 642.  The Ninth Circuit rejected defendant's argument that the clear-and-convincing standard should have been applied to the sentencing factors in that case and reaffirmed its pre-Booker precedent that "[a]s a general rule, the preponderance of the evidence standard is the appropriate standard for factual findings used at sentencing."  Id. at 642 (citing United States v. Howard, 894 F.2d 1085, 1089 (9th Cir. 1990)).

This holding is consistent with the Ninth Circuit's holding in United States v. Ameline, 409 F.3d 1073 (2005)(en banc).  In Ameline, the Ninth Circuit held that Booker did not alter the allocation of the burdens of proof at sentencing, as previously enunciated in United States v. Howard, 894 F.2d 1085 (9th Cir. 1990), a pre-Booker decision.  Id. at 1086.  In so holding, the Ninth Circuit recognized that when resolving factual disputes at sentencing, "the district court must continue to apply the appropriate burdens of proof, consistent with Howard."  Id.  The Howard decision clarified that the preponderance standard was the appropriate standard

of proof for fact-finding during sentencing under the then-mandatory Guidelines.  894 F.2d at

1090.  The same is true under the advisory Guidelines.  If, as <u>Ameline</u> holds, the allocation of

the burdens of proof as set forth in <u>Howard</u> continue to apply after <u>Booker</u> just as it was under

the mandatory Guidelines, there is no reason to conclude that <u>Booker</u> modified the

preponderance standard of proof, also approved in <u>Howard</u>.

### 2. Due Process Claim

Movant also argues that the Sentencing Guidelines require proof of sentencing

factors beyond a reasonable doubt to comport with the Due Process Clause.  (document # 1317

at 27) The Supreme Court has rejected due process challenges to the use of the preponderance

of the evidence standard at sentencing.  <u>McMillan v. Pennsylvania</u>, 477 U.S. 79 (1986) and

<u>Booker</u> did not change this precedent.

In <u>McMillan</u>, the Supreme Court upheld against both Due Process and Sixth

Amendment challenges a state sentencing scheme which imposed a mandatory minimum

sentence for certain enumerated offenses if the sentencing court found by a preponderance of

the evidence that the crime involved the visible possession of a firearm.  <u>Id.</u> at 84, 93.  The

Court concluded that, although  due process requires that elements of a crime must be proven

beyond a reasonable doubt, Pennsylvania's sentencing scheme enumerated "a sentencing factor

that comes into play only after the defendant has been found guilty of [one of the qualifying

offenses] beyond a reasonable doubt."  <u>Id.</u> at 85-86.   The Court further noted that while the

reasonable-doubt requirement could  "in certain limited circumstances [apply] to facts not

formally identified as elements of the offense charged, the challenged statute did not trigger that

requirement because it did not create impermissible "presumptions" of guilt, "relieve the

prosecution of its burden of proving guilt", raise the "maximum penalty for the crime

committed", or give the "impression of having been tailored to permit the visible possession

finding to be a tail which wags the dog of the substantive offense."  <u>Id.</u> at 86-88.  Thus, the

Court held that the firearm finding was a sentencing consideration that need not be proven

beyond a reasonable doubt. <u>Id.</u> at 90-91.

The <u>McMillan</u> Court also rejected defendant's argument that due process required a "clear and convincing" standard of proof at sentencing, concluding instead, that "the preponderance standard satisfies due process." <u>Id.</u> at 91. Because "sentencing courts have always operated without constitutionally imposed burdens of proof," the Court reasoned that, "embracing petitioner's suggestion that we apply the clear-and-convincing standard here would significantly alter criminal sentencing. . . ." <u>Id.</u> at 92 n. 8.

Since <u>McMillan,</u> the Court has reaffirmed that judicial fact-finding under a preponderance of the evidence standard at sentencing does not violate the Due Process Clause. In <u>United States v. Watts</u>, 519 U.S. 148 (1997), the Court ruled that "the application of the preponderance standard at sentencing generally satisfies due process." <u>Id.</u> at 156. (finding that the "Guidelines state that it is 'appropriate' that facts relevant to sentencing be proved by a preponderance of the evidence, U.S.S.G. § 6A1.3, comment, and we have held that application of the preponderance standard at sentencing generally satisfied due process.")(citing <u>McMillan</u>, 477 U.S. at 91-92). <u>Watts</u> held that the criminal conduct of which a defendant is acquitted at trial may be considered at sentencing, so long as the court finds the facts by a preponderance of the evidence. <u>Id.</u> at 157. The <u>Booker</u> majority cited <u>Watts</u> when explaining its decision to make the Guidelines advisory. The Court explained that the severance remedy was intended to preserve, as much as possible, the federal sentencing system as Congress had originally envisioned. <u>Booker,</u> 125 S.Ct. at 760. Under that system, judges were authorized to consider "real conduct" without limitation on the information they could consider for purposes of sentencing — including facts "that a jury had found *unproved* (beyond a reasonable doubt)." <u>Id.</u> (citing <u>Watts</u>, 519 U.S. at 157 (emphasis in original)). Thus, by preserving the "remainder of the [SRA]", <u>Id.</u> at 764, the <u>Booker</u> Court preserved the principle that a sentencing court may rely on facts not proven beyond a reasonable doubt without violating the due process clause.

In summary, <u>Booker</u> is consistent with precedent that have held that judicial fact finding under the preponderance of the evidence standard at sentencing does not violate the Due Process Clause. Thus, sentencing courts may continue to find relevant facts by a preponderance of the evidence without violating the Due Process Clause. <u>United States v. Melcher-Zaragoza,</u>

351 F.3d 925, 928 (9ᵗʰ Cir. 2003)(stating that "[o]rdinarily, application of the preponderance standard of proof to the Guidelines factors satisfies due process.")   Accordingly, the district court properly determined Movant's sentence based on facts established by a preponderance of the evidence.

### 3.  "Clear and Convincing" Standard

Respondent concedes that the Ninth Circuit has applied a "clear and convincing" standard of proof under limited circumstances where certain Guideline enhancements would have an "extremely disproportionate effect" on the sentence.  United States v. Jordan, 256 F.3d 922, 929 (9ᵗʰ Cir. 2001)(finding that a 9-level enhancement which exposed defendant to an 81-110 month increase in sentence presented an "exceptional case."); United States v. Bonilla-Montenegro, 331 F.3d 1047, 1050 (9ᵗʰ Cir. 2003)(finding that a 16-level enhancement which increased the sentencing range from 6-12 months to 63-78 months was exceptional); United States v. Mezas de Jesus, 217 F.3d 638, 642-44 (9ᵗʰ Cir. 2000)(court applied heightened standard of proof when a 9-level enhancement increased the sentencing range from 21-27 months to 57-71 months.).

The Ninth Circuit issued the foregoing "clear and convincing" cases before Booker under the mandatory Guidelines scheme.  Therefore, it is reasonable to conclude that the pre-Booker cases holding that a clear and convincing standard applies to certain mandatory Guideline determinations has been modified or undermined by Booker.

Although the Ninth Circuit has not yet stated that the preponderance of the evidence standard is the standard for *all* Guidelines determinations after Booker, its recent decisions suggest that the preponderance test is the proper test  In United States v. Ameline, 409 F.3d 1073, 1085 (9ᵗʰ Cir. 2005)(en banc), the court noted that "'[t]he government bears the burden of proof for any fact that the sentencing court would find necessary to determine the base offense level.'"  Id. (quoting United States v. Howard, 894 F.2d 1089,1090 (9ᵗʰ Cir. 1990).  The court reiterated that the district court may rely on undisputed statements in the PSR at sentencing.  Ameline, 409 F.3d at 1085.  However, when a defendant objects to the PSR, the district court must resolve the factual dispute.  Id. at 1085-86.  The court stated that "[t]he fact

1  that the Sentencing Guidelines have become discretionary following <u>Booker</u> does not alter this

2  analysis" and "[w]hen a defendant contests the factual basis of a PSR, the district court remains

3  obligated to resolve the dispute before exercising its sentencing discretion under <u>Booker</u>." <u>Id.</u>

4  at 1086.  The <u>Ameline</u> court also clarified that in "resolving the factual dispute, the district court

5  must continue to apply the appropriate burdens of proof, consistent with <u>Howard</u>.  <u>Id.</u>   In

6  <u>Howard</u>, the Ninth Circuit stated that the "party bearing the burden of proof will be required to

7  meet a preponderance of the evidence standard."  894 F.2d at 1090.  Thus, under Ninth Circuit

8  law, the preponderance of the evidence standard is the proper standard at sentencing.

9  **C.  Loss Calculations/ Money Laundering Calculation**

10            In his fifth ground for relief, Movant also argues that appellate counsel was

11  ineffective in failing to challenge the district court's determination of the fraud and money

12  laundering losses.  (document # 1311 at 45)  Movant first argues that a jury was required to

13  make the loss findings beyond a reasonable doubt.  As discussed above, this argument lacks

14  merit.  The proper test for determining the amount of loss is the preponderance of the evidence.

15  <u>Ameline</u>, 409 F.3d 1068 (citing <u>United States v. Howard</u>, 894 F.2d 1085, 1090 (9th Cir. 1990)).

16  Movant further claims that the loss calculations were erroneous.  He argues that the fraud loss

17  should have been limited to 28 counts of fraud conviction, or only $173,675.00 (as opposed to

18  approximately $10 million found by the district court after evidentiary hearings.)   (document

19  # 1311 at 39)  Movant then argues that if the fraud loss is only $173,675.00, the money

20  laundering loss figure of $3.5-$6.0 million which the trial court used is also wrong.  (document

21  # 1176 at 32)

22            Under § 2255, a defendant may challenge his federal sentence imposed upon him

23  on the ground that it violates the Constitution or laws of the United States, or that the court

24  lacked jurisdiction to impose the sentence, or that the sentence exceeded the maximum

25  authorized by law.   <u>Hamilton v. United States</u>, 67 F.3d 761, 763-64 (9th Cir. 1995).  Here,

26  Movant's challenge to the fraud and money laundering loss calculations does not fit within those

27  limitations and, therefore, is not cognizable under § 2255.

28

Additionally, the district court properly considered all of the evidence regarding fraud and money laundering for sentencing purposes, because relevant conduct is not limited to the criminal acts for which the defendant was convicted.  Rather, relevant conduct includes "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction," whether based on the defendant's own actions, or acts by others that are "reasonably foreseeable [and] in furtherance of the jointly undertaken activity." U.S.S.G. § 1B1.3(a)(2).

United States Sentencing Guidelines § 2F1.1 required the district court to consider the entire loss caused by the fraudulent scheme, and the loss is not limited by the counts of conviction. USSG § 2F1.1 comment. n. 7 (2000); United States v. Fine, 975 F.2d 596, 599 (9th Cir.1992) (en banc).

In this case, following an evidentiary hearing, the district court found that the fraud loss was approximately $ 10 million.  (Tr. 5/3/1999 at 21-239; Tr. 6/28/1999 at 77; Tr. 8/2/1999 at 8) The court's finding was based on bank records and internal sales receipts from American Eagle's Atlanta office for approximately 330 victims who sent money to American Eagle.  (Id.) The eleven testifying victims alone lost $1.2 million. For example, John Parian, an 85-year-old retiree sent American Eagle $147,000 (Tr. 10/17/98 5687, 5689, 5871-72, 5890).  Alice and Wilbur Jordan, retirees, sent American Eagle $165,000 (Tr. 9/1/98 3951, 3969, 3967, 3968; Exh. 192A, 186).  Mary Jane Katrel, a 74-year-old retiree, sent American Eagle $375,000.  (Tr. 10/15/98 6399, 6374, 6377, 6378, 6379, 6381, 6386, 6398, Exh. 213, 220, 227, 222, 223, 229, 217, 221, 231).  Roberta Dixon, an 85-year-old widow, sent American Eagle $181,000. (Tr. 10/15/98 6487, 6489-90, 6492, 6494, 6497, 6498, 6536, 6537, 6539-41; Tr. 10/20/98 6574, 6542, 6544, Exh. 100, 121, 123, 102, 1206, 1206, 116B, 127, 106, 1207, 116E, 116G, 107, 108).

The United States Sentencing Guidelines provide a base offense level for fraud and based on the amount of the monetary loss the fraud caused, the level increases incrementally. U.S.S.G. § 2F1.1(a)(b)(1).  For purposes of section (b)(1), the loss need not be determined with precision. "The court need only make a reasonable estimate of the loss given the available

information . . . ."  United States v. King, 257 F.3d 1013, 1025 (9th Cir. 2001).  In view of the evidence presented at trial and at sentencing, Movant's argument that the fraud loss is less than $200,000 lacks merit.

The district court also ruled that the money laundering loss was between $3.5-6 million.  (Tr. 5/3/1999 at 21-239; Tr. 6/28/1999 at 92; Tr. 8/2/1999 at 16-17) The prosecution established that over $ 7 million in checks were written from the accounts into which the fraud proceeds had been deposited.  Therefore these funds were properly included in calculating the "value of the funds" laundered.  Monies laundered by co-conspirators were also properly included. See U.S.S.G. § 1B1.3(a)(1)(B).   The fraud and money laundering losses were litigated before the district court and the evidence supports the loss finding which was attributable to the fraud and the money laundering.  (Id.)

Movant claims that counsel was ineffective for failing to challenge the loss determinations.  To establish ineffective assistance of counsel, Movant must establish that (1) counsel's representation fell below an objective standard of reasonableness; and (2) he was prejudiced thereby.   Hill v. Lockhart, 474 U.S. 52, 56-58(1985)(citing Strickland v. Washington, 466 U.S. 668, 688-692 (1984)).  To establish prejudice, movant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."   Strickland, 466 U.S. at 694.  Although appellate counsel did not challenge the money laundering and fraud loss calculations on the grounds which Movant asserts, in view of the foregoing discussion, counsel's decision not to raise these issues does not render his assistance ineffective. Hamilton v. Vasquez, 17 F.3d at 1164 (stating that trial counsel was not ineffective in failing to raise an argument he reasonably concluded would not succeed.).

### D. Organizer/Leader Enhancement

Movant also argues that he was not an organizer or a leader of American Eagle's telemarketing operation, and therefore, appellate counsel was ineffective for failing to appeal the organizer/leader sentencing enhancement.  (document # 1311 at 39-40)

Section 3B1.1(a) of the United States Sentencing Guidelines provides for a four-level enhancement if the defendant "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." Id.  When determining whether a defendant was an organizer or leader, courts consider "the exercise of decision-making authority, the nature of the offense and the defendant's participation in the offense,  the recruitment of accomplices,  the claimed right to a larger share of the fruits of the crimes, and the degree of control and authority exercised over others." United States v. Ponce, 51 F.3d 820, 826 (9th Cir. 1995)(citing U.S.S.G. § 3B1.1 comment (n.4)).  The court, however, need not make specific factual findings supporting an upward adjustment for role in the offense. United States v. Rigby, 896 F.2d 392 (9th Cir. 1990).

Movant qualified as a  leader and organizer of American Eagle's telemarketing scheme under the Ponce factors.  The evidence established that Movant ran American Eagle's Phoenix office and jointly shared the decision-making authority for the Atlanta operation with co-defendant Micah Rudisill.  (Tr. 8/12/1998 at 2405; Tr. 8/25/1998 at 3407; Tr. 9/23/1998 at 4816, 4849)  In Phoenix, Movant received $10 million in checks from American Eagle customers, which was deposited into bank accounts that Movant controlled. (Tr. 8/12/1998 at 2393, 2405; Tr. 8/13/1998 at 2644; Tr. 8/18/1998 at 2910-11; Tr. 8/25/1998 at 3574; Tr. 9/23/1998 at 4856, 4883) From those bank accounts, Movant controlled the expenditure of funds to pay the operational expenses in Phoenix and Atlanta, and distributed the proceeds to the other participants in the telemarketing activities (Tr. 8/12/1998 at 2393, 2405; Tr. 8/20/1998 at 3276; Tr. 9/23/1998 at 4816; Tr. 9/29/1998 at 5197) Five or more individuals participated in the criminal activity and the scope of the fraudulent operation was extensive.

Because the government demonstrated by a preponderance of the evidence that Movant "exercised some control over others . . . or [was] responsible for organizing others for the purpose of carrying out the crime[,]" Movant's  challenge to the organizer/leader enhancement would have failed on appeal.  United States v. Alonso, 48 F.3d 1536, 1545 (9th Cir.1995).  Accordingly, appellate counsel properly exercised his judgment to determine that this issue would be meritless on appeal, and his performance was not deficient. Jones v. Barnes,

463 U.S. 745, 754 (1983) (appellate counsel must exercise professional judgment in selecting issues to be raised on appeal and does not have the duty to raise every claim suggested by a client); Shah v. United States, 878 F.2d 1156, 1162 (9th Cir.1989) (failure to raise a meritless legal argument  does not constitute ineffective assistance of counsel).

### E. Vulnerable Victim Enhancement

Movant next argues that appellate counsel was ineffective in failing to appeal the vulnerable victim enhancement on the ground that the district court did not make sufficient findings to support that enhancement. (document # 1311 at 47-48)

Section 3A1.1 of the Sentencing Guidelines provides for a two-level increase where "the defendant knew or should have known that a victim was unusually vulnerable due to age, physical or mental condition,  or that the victim was otherwise particularly susceptible to criminal conduct."  Id. Section 3A1.1 only requires that the defendant "knew or should have known" that a victim was unusually vulnerable.  United States v. O'Brien, 50 F.3d 751, 756 (9th Cir. 1995).  "[A] district court must find that a victim is 'vulnerable' by a preponderance of the evidence."  United States v. Williams, No. 05-30071, 2006 WL 70076, * 8 (9th Cir. March 21, 2006)(citing United States v. Dare, 425 F.3d 634, 642 (9th Cir. 2005)).  Section 3A1.1 states that a victim can be "unusually vulnerable due to age, [or] physical or mental condition," or "otherwise particularly susceptible to criminal conduct."   In determining whether a victim is "otherwise particularly susceptible to criminal conduct," the court should consider factors beyond the victim's age and mental and physical condition including the victim's characteristics, the victim's reaction to the criminal conduct, and the circumstances surrounding the criminal act.  United States v. Peters, 962 F.2d 1410, 1417 (9th Cir. 1992).  In this case, there are several factors which support the vulnerable victim enhancement.

First, Movant and his co-defendants knew that most of American Eagle's customers were elderly and vulnerable to solicitation due to their age.  The  testimony of cooperating co-defendants Rashada and Simone established that American Eagle rarely "qualified" persons younger than 60 for the telemarketing scheme because the telemarketers knew that elderly people were more likely to be trusting, to have disposable income, and to be living alone.  (Tr.

8/18/1998 at 2877, 2885; Tr. 9/29/1998 at 5139, 5145, 5147; Tr. 9/23/1998 at 5102-03)  This was corroborated by the birth dates on the sales orders, and the ages of the testifying victims, most of whom were in their late seventies or early eighties.   For example, John Parian, an 85-year-old retiree sent American Eagle $147,000 (Tr. 10/17/98 5687, 5689, 5871-72, 5890).  Alice and Wilbur Jordan, retirees, sent American Eagle $165,000 (Tr. 9/1/98 3951, 3969, 3967, 3968; Exh. 192A, 186).  Mary Jane Katrel, a 74-year-old retiree, sent American Eagle $375,000.  (Tr. 10/15/98 6399, 6374, 6377, 6378, 6379, 6381, 6386, 6398, Exh. 213, 220, 227, 222, 223, 229, 217, 221, 231).   Roberta Dixon, an 85-year-old widow, sent American Eagle $181,000. (Tr. 10/15/98 6487, 6489-90, 6492, 6494, 6497, 6498, 6536, 6537, 6539-41; Tr. 10/20/98 6574, 6542, 6544, Exh. 100, 121, 123, 102, 1206, 1206, 116B, 127, 106, 1207, 116E, 116G, 107, 108).  The foregoing supported a vulnerable victim enhancement.  United States v. Caterino, 957 F.2d 681, 683 (9th Cir. 1992)(affirming vulnerable victim enhancement where defendant used "the telephone to get behind the defenses of people who are frequently old people . . . ."); Williams, 2006 WL 700776, * 8 (noting that victim was elderly).

Additionally, Movant and his co-defendants knew that their victims were susceptible to the telemarketing because they had been previously "qualified" before they were approached for reloading.  United States v. Peters, 962 F.2d 1410, 1418 (9th Cir. 1992).  In Peters, the defendant operated a false credit card scheme by soliciting at least 30,000 persons who were on a mailing list called "Credit Problem Names."   Id.  In affirming a vulnerable victim enhancement, the Ninth Circuit noted that the defendant knew or should have known that persons with poor credit would be susceptible to fraud.  Id. at 1412, 1413, 1418.  Similarly, in this case, Movant should have known that customers who were persuaded to send American Eagle money after the initial sales pitch were susceptible to "reloading" – falling for future sales pitches.   The defendants used prior sale orders as leads in making reload sales.   Thus, Defendants knew their victims had been sold repeatedly and, therefore, were unusually susceptible to the scheme. The Ninth Circuit has recognized that reloading establishes both that the victim is particularly susceptible to criminal conduct and that the defendants knew or should have known of their victims' susceptibility. United States v. Randall, 162 F.3d 557, 559-60 (9th

Cir. 1998)(finding that defendant who participated in "reloading" aspect of fraudulent telemarketing scheme, under which former victims were contacted for additional "sales," was subject to "vulnerable victim" enhancement under Sentencing Guidelines, because "reloaded" victims were particularly susceptible to scheme and defendant knew or should have known of this susceptibility.).

Sufficient evidence supports the vulnerable victim enhancement in this case. Accordingly, appellate counsel was not ineffective in failing to raise this issue on appeal.

### F.  Money Laundering Jury Instruction

For the first time in his Amended § 2255 Motion Movant argues that a portion of the money laundering instructions was negated by other jury instructions, thereby relieving the government of its burden of proof on the money laundering counts.  (document # 1311 at 41-43)

Here, Movant did not challenge the jury instructions at trial or an direct appeal. Generally, a collateral challenge under § 2255 "may not do service for a direct appeal." United States v. Frady, 456 U.S. 152, 155 (1982); United States v. Dunham, 767 F.2d 1395, 1397 (9th Cir.1985).  "[A] prior opportunity for full and fair litigation is normally dispositive of a federal prisoner's habeas claim.  If the claim was raised and rejected on direct review, the habeas court will not readjudicate it absent countervailing equitable considerations; if the claim was not raised, it is procedurally defaulted and the habeas court will not adjudicate it absent countervailing equitable considerations (e.g. actual innocence or cause and prejudice)." United States v. Frady, 456 U.S. 152 (1982).  Because Movant failed to raise the jury instruction claim on direct appeal, he must show cause for his procedural default and actual prejudice resulting from the alleged errors in order to obtain collateral relief under § 2255.  Frady, 456 U.S. at 168.  To the extent that Movant alleges that he failed to raise this claim on direct appeal because he was bound by the actions of his appellate counsel, who failed to raise the claims, this is insufficient to establish cause for his procedural default.  Murray v. Carrier, 477 U.S. 478, 487-88 (1986). Movant does not establish any other basis to overcome the procedural bar. Accordingly, Movant's procedural default bars review of this claim.

## VI. Restitution Findings

In ground six, Movant contends that the trial court erred in ordering him to pay $8.7 million in restitution to American Eagle's victims.   He argues that the evidence did not support the amount of restitution and that the court should have excused him from paying restitution because he was unable to pay.  The Ninth Circuit affirmed the trial court's restitution order.

Movant cannot collaterally challenge his restitution order in a § 2255 motion. In United States v. Kramer, 195 F.3d 1129 (9th Cir. 1999), the defendant brought a § 2255 motion challenging a $156,000 restitution order on the grounds that the order violated his rights to due process and the effective assistance of counsel. Kramer, 195 F.3d at1130.  In Kramer, the Ninth Circuit held that "by its plain terms, § 2255 is available only to defendants who are in custody and claiming the right to be released. It cannot be used solely to challenge a restitution order." Kramer, 195 F.3d 1129 at 1130)(citations omitted).  Since Kramer, the Ninth Circuit has reaffirmed  that the types of claims cognizable under § 2255 are limited to "claims relating to unlawful custody," not those relating "only to the imposition of a fine." United States v. Thiele, 314 F.3d 399, 401 (9th Cir. 2002).  Thus, Movant's challenge to the restitution order fails.  "Nor does it matter that [Movant couches] his restitution claim in terms of ineffective assistance of counsel.  So did Kramer."  United States v. Thiele, 314 F.3d 399, 401 (9th Cir. 2002)(citing Kramer, 195 F.3d at 1130).

Moreover, the district court properly relied on 18 U.S.C. §§ 2327 and 3663(A) in ordering each defendant to pay full restitution of nearly $8.7 million to the victims of the American Eagle's scheme.  Section 2327, part of the Senior Citizens Against Marketing Scams Act of 1997 ("SCAMS"), requires defendants convicted of telemarketing fraud to pay restitution in the full amount of the victim's losses without regard to the defendant's economic circumstances.  18 U.S.C. § 2327(b)(4)(A)(stating that "[t]he issuance of a restitution order under this section is mandatory), 18 U.S.C. § 2327(b)(4)(B)(i)(stating that "[a] court may not decline to issue an order under this section because of the economic circumstances of the defendant); United States v. Baggett, 125 F.3d 1319, 1322 (9th Cir. 1997).

Section 3663(A) of Title 18, the Mandatory Victims Restitution Act of 1996 ("MVRA"), made substantive changes to the Victim and Witness Protection Act ("VWPA"), 18 U.S.C. §§ 3663-3664.  Under the MVRA, a trial court must order restitution in the full amount to each fraud victim, without consideration of the defendant's economic circumstances. 18 U.S.C. § 3664(f)(1)(A); Baggett, 125 F.3d at 1322.  Restitution was mandatory under both § 2327 and § 3663(A).  The district court held evidentiary hearings to determine the amount of loss and restitution.  The record supports the amount of loss and restitution.  (Tr. 5/3/99 21-239, Tr. 6/28/99 77; Tr. 8/2/99 at 8)  Accordingly, appellate counsel did not render ineffective assistance in failing to challenge the imposition of restitution.

**VII. Cumulative Errors**

Finally, Movant argues that his appellate attorneys were ineffective for failing to challenge the "cumulative effect" of the trial errors.  For the reasons set forth above, Movant's several claims of ineffective assistance of counsel lack merit.  Separately and cumulatively, the alleged errors do not support Movant's motion to vacate his convictions and sentences. Accordingly, Movant's claim fails.

**DISCOVERY AND EVIDENTIARY HEARING**

Finally, Movant requests discovery in this case.  (document # 1173) Since Movant filed his request for discovery, he filed an Amended § 2255 Motion and did not renew his discovery request.  Additionally, the record before the Court contains sufficient evidence to resolve Movant's claims.  Therefore, the request for discovery should be denied.

Movant also argues that he is entitled to an evidentiary hearing on his § 2255 motion.  (document # 1174) Pursuant to Section 2255, "'[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing . . . and determine the issues and make findings of fact and conclusions of law.'"  Watts v. United States, 841 F.2d 275, 276 (9th Cir. 1987)(quoting 28 U.S.C. § 2255).  Section 2255 only requires that the court carefully consider petitioner's claims "including a full opportunity for presentation of relevant facts."  Watts, 841 F.2d at 277 (citation omitted).

In this case, the record demonstrates that Movant is not entitled to relief under § 2255.  Accordingly, Movant is not entitled to a hearing in this matter.  <u>Watts</u>, 841 F.2d at 278 (holding that petitioner was not entitled to a hearing where the record conclusively showed that petitioner was not entitled to relief.)

<u>**CONCLUSION**</u>

Based on the foregoing, Movant's § 2255 Motion should be denied in part and granted in part.  The Motion should be granted to the extent that the District Court should, in an abundance of caution and in consideration of Respondent's suggestion that Movant be afforded such relief, conduct proceedings (which may amount to review of the record without a hearing) in accordance with <u>Ameline</u> to determine whether the Court would impose the same sentence under the now-advisory Sentencing Guidelines.  <u>Ameline</u>, 409 F.3d at 1085-86.  The Motion should be denied in all other respects.

Accordingly,

IT IS HEREBY RECOMMENDED that Movant's Amended Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 (document # 1310) be **GRANTED in part and DENIED in part.**

IT IS FURTHER RECOMMENDED that Movant's Amended § 2255 Motion be granted to the extent that the District Court should conduct proceedings in accordance with <u>United States v. Ameline</u>, 409 F.3d 1073 (9th Cir. 2005) to determine whether the Court would impose the same sentence under the now-advisory Sentencing Guidelines.  The Motion should be denied in all other respects.

IT IS FURTHER RECOMMENDED that Movant's Request for Discovery (document # 1173) and Motion for an Evidentiary Hearing (document # 1174) be **DENIED.**

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals.  Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the District Court's judgment.  The parties shall have ten days from the date of service of a copy of this recommendation within which to file specific written objections with the Court.  *See,* 28 U.S.C. § 636(b)(1); Rules 72,

6(a), 6(e), Federal Rules of Civil Procedure.  Thereafter, the parties have ten days within which to file a response to the objections.  Failure timely to file objections to the Magistrate Judge's Report and Recommendation may result in the acceptance of the Report and Recommendation by the District Court without further review.  *See United States v. Reyna- Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003).  Failure timely to file objections to any factual determinations of the Magistrate Judge will be considered a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the Magistrate Judge's recommendation. *See*, Rule 72, Federal Rules of Civil Procedure.

DATED this 14th day of April, 2006.

Lawrence O. Anderson
United States Magistrate Judge